FILED

MAY 1 3 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ELAINE L. CHAO, SECRETARY OF
LABOR, UNITED STATES
DEPARTMENT OF LABOR,

Civ. No. 08-6302-AC

              Plaintiff,

AMENDED[1]
OPINION AND
ORDER

     v.

WESTSIDE DRYWALL, INC., a
corporation; and MOHSEN SALEM, and
SHIRINE SALEM,

             Defendants.

---

ACOSTA, Magistrate Judge:

*Introduction*

    The Secretary of the United States Department of Labor ("Secretary") brings this action

---

    [1]This opinion and order is amended for the sole purpose of replacing the word "before"
with the word "after" on page 25.

Page 1  - OPINION AND ORDER                   *AFW*

against defendants Westside Drywall, Inc. ("Westside"), Mohsen Salem ("Mr. Salem"), and Shirine Salem ("Ms. Salem") (collectively, "Defendants") on behalf of 52 laborers, seeking to enjoin Defendants' willful and non-willful violations of the overtime and record keeping provisions of sections 6, 7, 11, 15, 16(c), and 17 of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 *et seq.*) ("FLSA" or "the Act").  The Secretary seeks back wages and overtime pay, liquidated damages, and injunctive relief.  Presently before the court are the Secretary's motion to amend Exhibit A of the Complaint, and Defendants' motions to strike, for summary judgment, and for sanctions.

The court held oral argument on April 5, 2010.  Defendants' motion to strike is granted, Defendants' motion for summary judgment is granted in part and denied in part, Defendants' motion for sanctions is denied, and the Secretary's first and second motions to amend are denied.

*General Background*

In April 2007 the Secretary began an investigation of Defendants' pay practices.  The Secretary filed its FLSA complaint against Defendants eighteen months later, on October 1, 2008.  Attached to the Secretary's complaint as Exhibit A is a two-page list containing the names of fifty-two persons ("claimants") the Secretary claims Defendants employed but failed to properly pay and for whom Defendants did not maintain proper records, all in violation of the FLSA.  The Secretary filed a First Amended Complaint later that same day, October 1, 2008, to correct the spelling of Mr. Salem's first name.  (Am. Compl. pp. 1, lines 19-21).

The gravamen of the Secretary's charge is that Defendants seek to avoid their obligations under federal law by using certain "subcontractors" as an artificial barrier between Westside and its laborers.  Specifically, the Secretary alleges that Defendants have an arrangement with certain

"subcontractors" to provide laborers whom Defendants instruct and control but for whose work Defendants pay the "subcontractor." The subcontractor in turn takes part of each payment as an illegal kickback for the arrangement before distributing the remainder in cash payments to the laborers, often at rates below the FLSA minimum wage. The Secretary alleges that this virtually invisible and untraceable violation of the FLSA is maintained through the threat of immediate termination, not just for the complaining laborer, but the laborer's friends and family as well – a serious risk for a labor force consisting largely of extended family relations.

Defendants respond that they are in full compliance with the FLSA. Defendants admit that, consistent with industry practice, Westside subcontracts certain labor components of its business. However, Defendants emphatically deny maintaining any relationship resembling that which the Secretary alleges. Defendants further argue that if in fact any claimants have been the victims of unlawful pay practices, that offense must be charged to the offending subcontractor, not Defendants.[2]

*Motion to Strike*

I. Facts

Defendants' motion to strike raises a preliminary procedural matter regarding the admissibility of certain evidence offered by the Secretary. Specifically, Defendants object to portions of paragraphs 4 and 12 of the Amended Declaration of Karen Clark In Support of the Secretary's Response to the Defendants' Motion for Summary Judgment ("Am. Clark Decl."), and the attached Exhibit A, pages 1 through 14, and Exhibit B in its entirety, on grounds that these statements and exhibits are inadmissible hearsay under FEDERAL RULE OF EVIDENCE ("FRE") 802.

---

[2]The facts specific to the individual motions decided herein are discussed in connection with each motion.

The last two sentences of paragraph 4 state: "[Sabas Fernandez Hernandez] related that when he worked on Saturdays, the builder would provide the combination to Westside's supervisors who, in turn, gave it to Westside's employees. Lastly, he told me that when he was rehired by Westside in March 2008, Mr. Salem paid him approximately $2,300.00 in cash." (Am. Clark Decl. ¶ 4). The first sentence in paragraph 12 states "Mario Alberto Luna told me that he worked for Westside in 2004, 2005, and 2006." (Am. Clark Decl. ¶ 12).

Pages 1 through 4 of Exhibit A are two copies of a two-page form document titled "Employee Personal Interview Statement." Both list "Sabas Fernandez-Hernandez" as the employee, "Westside Drywall" in Hubbard as the employer, "patch/drywall labor" as the occupation, and September 16, 2005 to June 27, 2006 as the period employed. The first document (pages 1 and 2 of Exhibit A) is typed in Spanish, dated September 17, 2007, bears the signature "Sabas Fernandez," the statement "Taken by WHI Clark" ("Clark") below the signature, and is stamped "received" by the Portland District Office Wage & Hour Division September 21, 2007. As the document is not completed in English, this court makes no attempt to decipher its contents. The second document (pages 3 and 4 of Exhibit A) appears to be a translation of the first document: it is typed in English with a notation at the end "[t]ranslation to English by WHI Clark." This document does not bear any signatures and is not stamped "received." Pages 5 through 14 of Exhibit A are copies of what appears to be time sheets filled in by hand, which alternately lack identifying information entirely or show only the incomplete name "Alan" at the top.

Exhibit B is a copy of the two-page "Employee Personal Interview Statement" form document completed by hand, dated March 17, 2008, and bears the signature "Mario A. Luna" with the statement "Taken by WHI Clark" below the signature. It shows "Mario Luna" as the employee,

"Westside Drywall" in Hubbard as the employer, "scrap pick up" as the occupation, and shows the period employed as "5-6 yrs to 1 yr ago." It is not stamped "received" by the Portland District Office Wage & Hour Division. Neither Exhibit A nor Exhibit B are accompanied by affidavit or the sworn declaration of Hernandez or Luna stating that they are, respectively, the authors of these documents.

II. Legal Standard

Evidentiary affidavits filed in connection with motions for summary judgment must be made "on personal knowledge," with "[s]worn or certified copies" of any supporting documents attached. FEDERAL RULE OF CIVIL PROCEDURE ("FRCP") 56(e). Where a party attempts to introduce an exhibit by attaching it to a declaration or affidavit, FRCP 56(e) requires that the declarant or affiant have personal knowledge of the exhibit. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 777 (9th Cir. 2002). The evidence presented by both parties must be admissible. FRCP 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Hearsay statements in affidavits are inadmissible. *Japan Telecom, Inc v. Japan Telecom Am. Inc.*, 287 F3d 866, 875 n.1 (9th Cir. 2004). Hearsay is any out-of-court statement, whether oral or written, offered in evidence to prove the truth of the matter asserted. FRE 801(a), (c). In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under FRE 801(d) or falls within a hearsay exception under FRE 803, 804, or 807. *See* FRE 802; 30B *Federal Practice & Procedure: Evidence* § 7031 at 279. When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule. FRE 805; *United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997).

//

## III. Analysis

### A. The Evidence Is Hearsay

The last two sentences of Paragraph 4 and the first sentence of Paragraph 12 of Clark's amended declaration relate statements made to her by third persons, thus they are hearsay and subject to exclusion unless an exception to the hearsay rule applies. Likewise, Exhibit A, pages five through fourteen, consists of written statements made out of court, therefore this portion of Exhibit A is also hearsay and subject to exclusion unless an exception to the hearsay rule applies. Exhibit A, pages one through four, and Exhibit B present a double layer of hearsay: the documents themselves are hearsay and the statements within them are also hearsay, or "hearsay within hearsay." Therefore all of the evidence objected to is subject to exclusion unless an exception to the hearsay rule applies to each hearsay statement.

### B. There Are No Applicable Exceptions to the Hearsay Rule

#### 1. Exhibit A, pages 5 through 14

Because the Secretary attempts to introduce Exhibit A through Karen Clark's affidavit, she must have personal knowledge of the document or otherwise be able to authenticate it under FRE 901 or 902. Clark describes no personal knowledge of pages five through fourteen of Exhibit A, nor does she describe any other manner in which she is otherwise competent to testify about their contents. The origin, contents, and significance of these documents are not discussed in her affidavit, and the documents are facially devoid of any identifying information supporting any conclusion about their author. The court perceives no applicable alternative method of authentication under FRE 901 or 902. These documents are improperly authenticated and therefore inadmissible. Even if these documents were properly authenticated, they are hearsay and thus

*AFW*

subject to exclusion unless an exception to the hearsay rule applies. The court finds no applicable exception to the hearsay rule for these documents, therefore they are also inadmissible hearsay. For these reasons, pages five through fourteen of Exhibit A are excluded from evidence.

2. Paragraph 4 and Exhibit A

The last two sentences of Paragraph 4 relate statements made to Clark by Hernandez. Paragraph 4 cites Exhibit A for support. As described above, Exhibit A, pages one through four, appears to be the written transcription of an interview Clark took from Hernandez in Spanish and her translation of that interview to English, and thus present a double layer of hearsay. Clark may be able to authenticate the documents by testifying that she wrote them, signed them, and witnessed Hernandez sign his statement, thus the documents themselves could be introduced into evidence through her testimony. *Orr*, 285 F.3d at 774 n.8 (noting that a document may be authenticated in this manner under [FRE] 901(b)(1)) (internal citation omitted). However, Clark still lacks personal knowledge of the facts related by Hernandez and thus is not competent to testify about these statements. Barring an affidavit or adoption of these statements from Hernandez, the last two sentences of Paragraph 4 and Exhibit A, pages one through four, are subject to exclusion unless an exception to the hearsay rule applies.

The Secretary argues that these statements are admissions by a party opponent, and thus admissible under FRE 801(d)(2)(D) as an exception to the hearsay rule. As proponent of this evidence, the Secretary must demonstrate that this evidence is "a statement by [Defendants'] agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FRE 801(d)(2)(D); *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986). The Secretary argues that Hernandez's job at Westside made him Westside's agent

*AFW*

for purposes of this information.  In order to fall within this exception, the hearsay statement must have been made while Hernandez was Westside's employee.  The statement at issue was made September 17, 2007. The record shows that in 2007, Hernandez first worked for Canby Drywall and next for Bruce Packing, apparently as a temporary worker placed through the agency Express Personnel Services.  By his own testimony, Hernandez did not work for another employer between leaving Canby Drywall and starting the job for Bruce Packing, and he did not work for Westside prior to March of 2008.  There is no evidence in the record that Hernandez was employed by or otherwise had an agency relationship with Defendants in 2007 when the statements at issue were made.  Even if an agency relationship existed, there is no evidence that the statements made were of the kind that Hernandez would be authorized to make on behalf of Westside.  Therefore the FRE 801(d)(2)(D) hearsay exception does not apply to these statements.  Because there is no other applicable hearsay exception, the last two sentences of Paragraph 4 and pages one through four of Exhibit A are inadmissible, and excluded from evidence.

3. Paragraph 12 and Exhibit B

The first sentence of Paragraph 12 relates a statement made to Clark by Luna, and cites Exhibit B for support.  Exhibit B appears to be a written transcription of an interview Clark took from Luna.  As described above, Clark may be able to authenticate Exhibit B under FRE 901(b)(1) by testifying that she wrote it, signed it, and witnessed Luna sign it as well.  However, Clark lacks personal knowledge of the facts related by Luna and, barring an affidavit or adoption of these statements from Luna, these statements are subject to exclusion unless an exception to the hearsay rule applies.

The Secretary argues that paragraph 12 and Exhibit B are offered only to explain why the

*AFW*

Secretary filed this action, not for the truth of the matter asserted therein, and therefore are not hearsay. FRE 801(c). If offered in support of the argument that, at the time this action was filed, the Secretary had a good faith belief that a violation of the FLSA had occurred, the evidence would indeed be admissible. Thus this evidence is relevant as it relates to Defendants' motion for sanctions. However, Defendants' motion for summary judgment does not raise this issue. Not surprisingly, then, the Secretary does not reference either Paragraph 12 or Exhibit B anywhere in the response to Defendants' motion for summary judgment. To the extent that these statements are offered to establish Luna as a representative of other non-testifying claimants, the Secretary seeks to draw the inference that other non-testifying claimants would give similar statements if they were called to testify. This inference depends on the truth of Luna's statements regarding the number of hours he worked, how many days a week he worked, how he was paid, and who paid him. The statements in paragraph 12 and Exhibit B are therefore offered for the truth of the matter stated and are hearsay. Because there is no other applicable hearsay exception, these statements are inadmissible and excluded from evidence

   C.   *Conclusion*

   For the reasons stated above, Defendants' motion to strike is GRANTED to the extent that the evidence objected to is offered to defeat the motion for summary judgment. However, to the extent that the Secretary offers the evidence to show that Clark took statements from Hernandez and Luna on certain dates, and to prove the Secretary's good faith belief in filing this action, the evidence is admitted.

*//*

*//*

*Motion for Summary Judgment*

## I. Preliminary Procedural Matter

Before reaching the merits of the parties' arguments, the court must first address the admissibility of the evidence submitted by the parties. A motion for summary judgment must be supported by evidence admissible at trial. FRCP 56(e). Authentication is a condition precedent to the admissibility of all supporting documents. FRE 901(a). The Ninth Circuit has repeatedly held that "unauthenticated documents cannot be considered in a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

Defendants have offered twenty-two exhibits (numbered exhibits 1 through 22) attached to the Declaration of Clay D. Creps in Support of Motion for Summary Judgment ("Creps Decl."), three exhibits (numbered exhibits A through C) attached to the Declaration of Krista N. Hardwick in Support of Defendants' Motion for Summary Judgment ("Hardwick Decl.") and three additional exhibits (numbered exhibits A through C) attached to the Ms. Hardwick's Declaration In Support of Defendants' Supplemental Brief ("Hardwick Supp. Decl."). The Secretary offers fifteen exhibits (numbered 1 through 11 and A through D) attached the declaration of Matthew L. Vadnal ("Vadnal Decl.") in support of its response opposing the motion for summary judgment, three exhibits (numbered A through C) attached to the amended declaration of Karen A. Clark ("Am. Clark Decl."), and seven additional exhibits (numbered A through G) attached to Mr. Vadnal's Declaration In Support of the Secretary's Response to Defendants' Supplementary Brief ("Vadnal Supp. Decl."). A significant number of these exhibits have not been properly authenticated by the parties and are therefore inadmissible; the court addresses this evidence below. Except as noted below, the evidence offered by the parties is accepted as admissible for summary judgment purposes.

Page 10 - OPINION AND ORDER                                          *AFW*

## A. Depositions

Combined, the parties have submitted thirty-two excerpts from the deposition testimony of nineteen claimants. The court notes that the Secretary has failed to provide the reporter's certificate for twelve of its seventeen deposition excerpts, and has provided only a blank, unsigned reporter's certificate for the remaining five deposition excerpts. Defendants have failed to provide the names of the deponent and the action as well as the reporter's certificate for three of its deposition excerpts. When offered at summary judgment, deposition excerpts must identify the names of the deponent and the action and must include the reporter's certification that the deposition is a true record of the testimony of the deponent. *Orr*, 285 F.3d at 774 (*citing* FRE 901(b); FRCP 56(e) and 30(f)(1)). The affidavit of a party's counsel providing the names of the deponent, the action, and the reporter, with a statement that the attached copy is a "true and accurate copy" is not a sufficient substitute, without more, to satisfy the authentication requirement; "such an affidavit lacks foundation even if the affiant-counsel were present at the deposition." *Id.* (*citing Beyene v. Coleman Security Servs*, 854 F.2d 1179, 1182 (9th Cir. 1988)). Once a document is properly authenticated by one party, the requirement of authenticity is satisfied with regard to all parties and the document may not be excluded on grounds of inadequate authentication when submitted by another party. *Id.* at 775-76.

Neither party has provided the reporter's certification page for the following deposition excerpts: Francisco Ramirez Ojeda (Hardwick Supp. Decl., Ex. A; Vadnal Supp. Decl., Ex. F); Luis Humberto Rodrigues Jimenez (Hardwick Supp. Decl., Ex. B; Vadnal Supp. Decl., Ex. C); Jose Mondragon Gaspar (Hardwick Supp. Decl., Ex. C; Vadnal Supp. Decl., Ex. D); and Alan Rafael Garcia Bogarin (Vadnal Decl., Ex. 9). This evidence is not properly authenticated and therefore is not admissible.

*AFW*

The Secretary has offered the following deposition excerpts with only a blank, unsigned copy of the reporter's certification page attached: Carlos Augusto Martinez (Vadnal Decl., Ex. 7; Vadnal Supp. Decl. Ex. G); Jesus Christian Avila (Vadnal Decl., Ex. 8); and Juan David Gonzales Torres (Vadnal Decl., Ex. 10). Deposition excerpts submitted without the court reporter's signed certification are properly excluded at the summary judgment stage. *Orr*, 285 F.3d at 774 (*citing Pavone v. Citicorp Credit Servs., Inc.*, 60 F. Supp. 2d 1040, 1045 (S.D. Cal. 1997), *aff'd*, 172 F.3d 876 (9th Cir. 1999)). This evidence is not properly authenticated and therefore is not admissible.

Defendants have submitted properly authenticated copies for all of the remaining deposition excerpts, satisfying the authentication requirement for all parties. The court therefore admits all other deposition excerpts into evidence.

### B. Defendants' Exhibit 18

Defendants Exhibit 18 consists of thirteen declarations from various general contractors, subcontractors, and Westside employees. An unsworn declaration can have the force and effect of a sworn affidavit if it is signed, dated, and carries a declaration that the statement is true under penalty of perjury, and therefore may be used in lieu of the FRCP 56(e) affidavit requirement. 28 U.S.C. § 1746; FRCP 56(e). The first three declarations contained within Exhibit 18 (Tim Leslie, pg. 1-2; Dave Templeton, pg. 3-4; Gerald Rowlett, pg. 5-6) are not given under penalty of perjury. These declarations are not made in accordance with 28 U.S.C. § 1746, therefore they do not satisfy the requirements of FRCP 56(e) and are not admissible as evidence. *Tearfie v. Whittlesea Blue Cab Co.*, No. 98-16377, 1999 WL 278100, at *1 n. 4 (9th Cir. Apr. 12, 1999) (declining to consider affidavit not made under penalty of perjury); *Reese v. Baldwin*, No. 97-35894, 1998 WL 452092, at *1 (9th Cir. July 27, 1998) (district court did not abuse its discretion by excluding statement not

*AFW*

made under penalty of perjury as inadmissible). Page 7 of Exhibit 18 is also inadmissible; this page consists of a random series of notes on an otherwise blank sheet of paper and is submitted without any proper foundation or other authentication.

The remaining portion of this exhibit consists of ten declarations, each signed and given under penalty of perjury. Although eight of the declarations do not show the day they were signed, they do indicate the month and year, which is sufficient to satisfy the date requirement. *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 999 (C.D. Cal. 2000). Accordingly, these ten declarations (Ex. 18 pp. 8-28) satisfy the requirements of 28 U.S.C. § 1746 and are admitted into evidence.

### C. Defendants' Exhibit 17

Defendants' Exhibit 17, pages 1 through 4, is a U.S. Department of Labor document form number WH-56, titled "Summary of Unpaid Wages," dated February 2, 2009; it shows Karen Clark as the investigator and Westside Drywall, Inc., P.O. Box 99, 2755 Pacific Hwy 99, Hubbard OR 97032 as the employer, and a case id number of 1475678. The four page, five column form lists 53 names with corresponding "Period Covered by Work Week Ending Dates" and "Gross Amounts Due." Exhibit 17, pages 7 through 10, is a second copy of this same document dated March 28, 2008. The only apparent difference in the content of the documents is the addition of Sergio Ayala Ramos as a claimant on the copy dated February 2, 2009. Pages 5, 6, and 11 through 65 of Exhibit 17 are copies of a U.S. Department of Labor document form number WH-55, titled "Wage Transcription and Computation Sheet," completed by hand, and signed "K. Clark" as the investigator.

Exhibit 17 is attached to the declaration of Clay Creps, with the attestation that these

*AFW*

documents are true and correct copies of the Secretary's calculations of wages. (Creps Decl. ¶ 20). FRE 901(b)(1) provides that a witness with knowledge of a document can authenticate it by testifying that it is "what it is claimed to be." FRE 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file. *See* FRE 901 advisory committee's note ("Public records are regularly authenticated by proof of custody, without more."). FRE 901(b)(4) provides authenticity may be satisfied by the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Here, while Mr. Creps describes no personal knowledge as to the creation of the documents in Exhibit 17, the documents were provided to him by the Secretary as part of the Department of Labor's official investigative files. Moreover, the appearance and contents of the documents are consistent with the representation that these are official documents maintained by the Department of Labor as part of its investigation of Defendants' alleged FLSA violations which are the subject of this case. This court therefore finds that there are sufficient indicia of authenticity support the admissibility of Exhibit 17 under FRE 901(a) and 901(b)(4).

### D. Exhibit C, Amended Clark Declaration

The amended declaration of Karen Clark attaches as Exhibit C a two-page document which appears to be a form of data table. The court is unable to decipher the meaning or significance of this exhibit. It is attached without explanation and is never referenced in Clark's declaration. Where a party attempts to introduce an exhibit by attaching it to a declaration or affidavit, FRCP 56(e) requires that the declarant or affiant have personal knowledge of the exhibit. *Orr*, 285 F.3d at 777. Clark's declaration is entirely devoid of any evidence as to the origin or significance of this document or any statement that would allow the court to conclude that this exhibit could be

AFW

authenticated through her personal knowledge or in any other manner allowed by FRE 901 or 902. Exhibit C is therefore not properly authenticated and inadmissible as evidence.

### E. Conclusion

For the reasons stated above, Defendants' Exhibit 18, pages one through seven (Creps Decl., Exh. 18, pp. 1-7) and Defendants' Exhibits A, B, and C (Hardwick Supp. Decl., Exh. A, B, and C) are excluded from evidence. The Secretary's Exhibits 7 through 10 (Vadnal Decl., Exh. 7, 8, 9, and 10) and Exhibits C, D, F, and G (Vadnal Supp. Decl., Exh. C, D, F, and G) are excluded from evidence. All other exhibits offered by the parties, that are not separately addressed in Defendants' motion to strike, are admitted as evidence for summary judgment purposes.

## II. Facts

Defendants move for summary judgment on four separate counts. For ease of analysis, the court reviews the factual basis for each claim separately, below.

### A. Statute of Limitations

Defendants argue that the Secretary's claims are barred in part by the statute of limitations. The action seeks damages and injunctive relief for willful and non-willful violations of the FLSA occurring from September 24, 2004, onward. (Am. Compl. ¶¶ 8-10). Prior to this action being filed, the parties signed four tolling agreements, which cumulatively provide that the period beginning December 1, 2007, until and including September 30, 2008, is not be included in the running of the statute of limitations. (Creps Decl., Ex. 1).

The Secretary initially opposed summary judgment on this issue. However, on March 15, 2010, the Secretary filed an unopposed motion to dismiss, with prejudice, all claims for back wages earned before December 1, 2004. (Docket No. 102). This motion was granted by order of the court

entered March 16, 2010. (Docket No. 107). Accordingly, only those claims based on events occurring on and after December 1, 2004, will be considered.

### B. Ms. Salem

The Secretary filed an unopposed motion to dismiss, with prejudice, defendant Shirine Salem on March 15, 2010. (Docket No. 102). This motion was granted by order of the court entered March 16, 2010. (Docket No. 107). Defendants' motion for summary judgment is therefore moot as to this defendant, and the factual basis for the claim need not be examined.

### C. Claims for Testifying Claimants

#### 1. Dismissed Claimants

The Secretary filed an unopposed motion to dismiss, with prejudice, claimants Efren Martinez Carmen, Florencio Diaz Bernabe, Miguel Angel Mendoza Herrera, Juan Ramirez Reyes, Luis Ernesto Sepulveda, and Angel Isaac Ramos Sotelo on March 15, 2010. (Docket No. 102). This motion was granted by order of the court entered March 16, 2010. (Docket No. 107). The motion for summary judgment is moot to the extent that it seeks judgment with regard to these claimants, and the factual basis for these claims need not be examined.

#### 2. Francisco Ramirez, Luis Umberto Rodriguez, and Jose Mondragon-Gaspar

No admissible evidence has been submitted in support of the parties' respective motions regarding these claimants. (Docket Nos. 83 & 86). Therefore there are no facts for the court to examine with regard to these claimants.

#### 3. Sabas Fernandez Hernandez

Defendants move for summary judgment with regard to Sabas Fernandez Hernandez ("Hernandez") on grounds that the evidence shows he is a Westside employee and has been properly

compensated for all work performed. (Concise Statement of Material Facts ISO Defendants' Motion for Summary Judgment ("DSOF") ¶¶ 5-11). Hernandez submitted a wage claim to BOLI February 4, 2007, (Clark Decl. ¶ 13, Ex. A pp. 24-26), and gave a statement to Clark on September 17, 2007. (Clark Decl. ¶ 4, Ex. A pp. 1-4). Clark calculated his wages owed as $16,656.64 for hours worked for the period starting September 25, 2004, through June 24, 2006. (Creps Decl., Ex. 2, pp. 26-27). Hernandez has been employed by Westside doing drywall patch work since March of 2008. (Hernandez Dep. 7:20-8:8). His prior employers were Bruce Packing, Canby Drywall, and Team Clean; he has provided paystubs from each of his them. (Hernandez Depo 12:3-13; Creps Decl., Ex. 2, pp. 13-19). The Team Clean, Inc., paystubs were issued at irregular intervals and cover the period between April 26, 2004, through June 5, 2004. (Creps Decl., Ex. 2, pp. 13-14). The Canby Drywall, Inc., paystubs were issued at 14 day intervals and cover the period beginning March 24, 2007, through June 23, 2007. (Creps Decl., Ex. 2, pp. 18-19). The Bruce Packing paystubs were issued at 1fourteen day intervals and cover the period starting December 30, 2007, through March 8, 2008. (Creps Decl., Ex. 2, pp. 21-25). Hernandez also provided three 2007 paystubs from Express Personnel Services, dated September 30, October 7, and October 14, showing the notation "BrucePac, Job I478." (Creps Decl., Ex. 2, pp. 11-12, 20). Hernandez denies that he worked for Westside during 2004, 2005, or 2006; he also denies that he is owed any back wages and does not wish the Secretary to pursue any claim on his behalf. (Creps Decl., Ex. 2; Hernandez Dep. 24:5-26:23).

### D. Claims for Non-Testifying Claimants

Westside has its own employees and also uses subcontractors for some of its work. (Declaration of Mohsen Salem In Support of Defendants' Motion for Summary Judgment ("Mr.

Salem Decl.") ¶¶ 7, 8; Creps Decl., ¶ 21 & Ex. 18  pp. 8-28).  Westside employees are hired to perform different jobs, such as cleanup (Creps Decl. Ex. 19, Luna Dep. pp. 34:12-20); patchwork (Creps Decl. Ex. 2, Hernandez Dep. pp. 7:21-8:5; Ex. 8, Ramos Dep. pp. 7:4-12); finishing, texturing, and taping (Creps Decl. Ex. 3, Sepulveda Dep. pp. 7:1-20), repair work (Creps Decl. Ex. 4, Carmen Dep. pp. 6:25-7:4); sheetrocking (Creps Decl. Ex. 5, Bernabe Dep. pp. 6:19-7:17); and spraying (Creps Decl. Ex. 6, Herrera Dep. pp. 6:22-7:8; Ex. 7, Reyes Dep. pp. 6:18-7:3).

The Secretary asserts wage claims on behalf of fifty-two claimants ranging in amount from $70.00 to $46,378.  (Creps Decl. Ex. 17 pp. 1-4, 7-10).  In calculating these claims, the Secretary has identified six "occupations":  drywall installer (Creps Decl., Ex. 17 pp. 6, 12-17, 19, 48-50, 55, 59, 63, 65), drywall laborer (Creps Decl., Ex. 17 pp. 20, 22, 43-47, 58), insulation (Creps Decl., Ex. 17 pp. 6, 26, 34, 36), patching (Creps Decl., Ex. 17 pp. 30, 54, 57), taper (Creps Decl., Ex. 17 pp. 29, 32, 38-41, 51), and mechanic (Creps Decl., Ex. 17 pp. 56).  Nine worksheets, including those for Efren Carmen, Florencio Diaz Bernabe, Miguel Mendoza Herrera, Juan Ramirez Reyes, Angel Ramos, Luis Ernesto Sepulvo [sic], simply show "payroll" in the "occupation" field.  (Creps Decl., Ex. 17 pp. 18, 21, 33, 35, 37, 52-53, 60, 62).  The "occupation" field is blank on the other nine worksheets.  (Creps Decl., Ex. 17 pp. 11, 23-25, 27-28, 31, 42, 61, 64).  Multiple claimants have failed to appear for their depositions despite being properly subpoenaed (Creps Decl. ¶ 18 &. Exs. 9-16), and others simply cannot be located or served, (Creps Decl. ¶ 19), despite the Secretary's efforts to obtain current contact information.  (Am. Clark. Decl. ¶ 5).

1. Israel Ayala Lugo

Israel Ayala Lugo ("Ayala") first started working for Westside in 2001. (Vadnal Supp. Decl., Ex. A, Ayala Dep. 26:7-9).  He went directly to Westside, where he spoke to Moe about a job.

(Ayala Dep. 21:10-18). Ayala told Moe he was a sheetrock hanger, and Moe sent him to work with a person named Vega or Vera. (*Id.* 25:3 - 26:16). Ayala did not fill out an application or other paperwork and did not appear on Westside's payroll. (*Id.* 19:24 - 20:11). He does not know what a subcontractor is. (*Id.* 20:12-13). He has never had his own contractor's license or his own drywall company. (*Id.* 58:6-13).

Ayala worked as a sheetrock hanger, typically from 6:30 or 7 in the morning until 7 or 8 at night, or until 9 at night during the summer; he normally worked on Saturdays but would be done by 3 p.m. at the latest, and very rarely worked on Sundays. (*Id.* 45:4 - 24, 55:22 - 56:9). Martin Ayala, Rogelio Ayala, Sergio Ayala, Augustine Ochoa, and Reynaldo Mendoza were all members of Ayala's crew. (*Id.* 47:21 - 48:15). The crew all worked the same hours. (*Id.* 48:20-22). Ayala does not know Juan Miguel Estrada, Cruz Sanchez, Gabriel Sanchez, or any person named Virgilio or Rigoberto. (*Id.* 52:21 - 53:6). Ayala owns his own tools and drove his own car to the worksite. (*Id.* 44:10 - 45:4). Project materials such as the sheetrock were already at the job site. (*Id.* 44:12-19). If they needed more materials to complete the project, Ayala and his crew would go to the Westside warehouse or, if they were too far away, they would go to suppliers such as Knez or ETS instead and charge the cost to the project number on the project site map. (*Id.* 58:14 - 59:2). Ayala and his crew members looked for work outside of Westside during slow times. (Creps Decl., Ex. 22 Ayala Dep. 36:19 - 37:10). They solicited work from Canby Drywall, Tri County Drywall, Kemper Drywall, and Mata Drywall. (*Id.* 37:11 - 38:11). December and January tended to be slow months just about every year. (*Id.* 39:3-12).

Ayala was paid by the square foot, not by the hour. (Vadnal Supp. Decl., Ex. A Ayala Dep. 29:4-6). Ayala and his crew filled out "time cards" indicating the square footage of the house they

*AFW*

were hanging sheetrock in, but Westside would pay according to the footage that the maps showed, which was generally less. (*Id.* 46:15-24). Ayala was first paid by a person named Sergio or Hector, then by Jose Rodriguez and Juan Manuel Jimenez. (*Id.* 32:2-14). Jose Rodriguez and Juan Jimenez gave him cash in an envelope for his pay; Ayala believed that they received a check from Westside which they cashed and then distributed among the crew. (*Id.* 33:12 - 34:22). Both Jose Rodriguez and Juan Jimenez took money out of his pay, allegedly for tax purposes. (*Id.* 46:25 - 47:10). Ayala thinks it is possible that by paying only Rodriguez and Jimenez, Westside avoided having non-licensed workers on the payroll, but has no idea why Westside would do this. (*Id.* 42:12 - 43:11).

For the first year, Ayala's supervisor was a person named Travis, then Juan Bogarin was his supervisor for the next two years; after that his supervisor was either Moe, Ismael, or Kamal depending on where he was working. (*Id.* 30:22 - 31:15). Moe visited the crew at project sites he was supervising. (*Id.* 39:18-23). He spoke with Ayala mostly regarding the price of the project, but also about the proper way to hang sheetrock. (*Id.* 40:6 - 41:13). Kamal visited the crew at job sites, but not very frequently. (*Id.* 41:14-16). Ismael visited the crew at job sites frequently, and talked to Ayala about both the work and other topics. (*Id.* 41:17-24; 54:9-17). These conversations typically lasted a maximum of twenty minutes. (*Id.* 41:25 - 22:11). Juan Jimenez never visited Ayala's crew at project sites, and when Ayala saw Jose Solano at a work site they did not talk about the project, just socialized during breaks. (*Id.* 55:9-15).

2. Martin Ivan Ayala Guerrero

Martin Ivan Ayala Guerrero ("Guerrero") knew Ayala had a crew and asked if he could work with them. (Vadnal Supp. Decl., Ex. B Guerrero Dep. 68:8-16). Guerrero worked hanging sheetrock from 6 or 7 in the morning until 6:30 or 7:30 at night six days a week, Monday through Saturday,

*AFW*

and would occasionally work on Sundays. (Guerrero Dep. 70:9 - 73:16). He had his own tools. (*Id.* 70:23-24). When he worked with Ayala's crew he used Ayala's vehicle, and later when he had his own crew he used his own vehicle to get to work. (*Id.* 76:2-6). Guerrero first worked with Rogelio, Sergio, Augustine, Daniel Solano Ayala, and Julio Ayala Lugo on Israel's crew, but did not work with either Antonio Pedroza or Romero Pedroza. (*Id.* 54:20 - 56:5). Guerrero does not know Juan Bogarin, Jorge Rodriguez Castillo, or Jorge Rodriguez Zuniga. (*Id.* 79:11-15). Guerrero later formed his own crew with Sergio, Marcos, and Leonel. (*Id.* 56:6-8). All members of Ayala's crew and Guerrero's crew worked exclusively as sheetrock hangers. (*Id.* 57:9-21). He was not instructed to form a crew but rather decided to do so on his own; he simply went and asked for work, and was not asked any questions about whether he was working with "JSR" or "JCR." (*Id.* 68:17 - 70:8).

Guerrero was paid by the square foot, not by the hour. (*Id.* 64:25 - 66:17). Guerrero was always paid in cash, first by Ayala and later by Jose Solano Rodriguez. (*Id.* 53:1 - 23). Guerrero tracked his work on a sheet provided by Westside and returned the completed form to Westside; he got this form and the project site map from the Westside office. (*Id.* 51:19 - 52: 9, Deposition Ex. 20). Guerrero had to identify the person that Westside would pay on the sheet he used to track his work; he did this by writing the initials "JSR," for Jose Solano Rodriguez, at the top. (*Id.* 50:5-51:8, Deposition Ex. 20). Guerrero does not recognize "JSR" as the name of a company. (*Id.* 67:13-18). The workers filled out the sheets, delivered them to Westside, and Solano picked up their bi-weekly pay. (*Id.* 64:21-24). Solano gave a lump-sum payment to Guerrero or another crew member with the understanding that they would then distribute it among the crew members. (*Id.* 63:20 - 64:24). Solano did not give Guerrero any paperwork with his pay. (*Id.* 95:7-21). If there were any discrepancies with his pay, Guerrero addressed this directly with Doug or Moe at Westside; Westside

*AFW*

either corrected the problem by adding in the missing pay to his next paycheck or denied that there was an error. (*Id.* 89:12 - 90:16). If a job was more difficult than usual, Guerrero spoke directly with Moe or the project supervisor to negotiate a higher rate of pay per square foot; those requests were not always approved. (*Id.* 97:15-20, 98:21 - 99:13).

This practice continued after Guerrero formed his own crew. Guerrero met Zech at a work site and took on a job hanging sheetrock that Zech offered; when that project was complete Zech offered Guerrero another house. (*Id.* 92:14-21). Guerrero asked where Zech worked, and Zech responded he was a supervisor for Westside. (*Id.* 92:22 - 93:1). One of Westside's employees is supervisor Zack Boeckman. (Creps Decl., Ex. 18 pp. 27-28). It became Guerrero's practice to go to Zech to get work, however, he and his crew continued to fill out the sheets and deliver them to Westside. (*Id.* 93:3-7). As leader of his own crew Guerrero was still paid in cash by Solano; Guerrero divided the cash among the crew members after deducting gas money and any expenses incurred for the project. (Vadnal Decl., Ex. 6 Guerrero Dep. 75:20 - 76:1).

Guerrero went to the Westside office to get work; he dealt primarily with Zech but would work with whoever had work. (Vadnal Supp. Decl., Ex. B Guerrero Dep. 81:15 - 82:16). Guerrero got job site maps directly from Westside supervisors. (Guerrero Dep. 81:15-25). The project supervisor's name and phone number are listed on the maps. (*Id.* 83:1 - 84:4; Creps Decl., Ex. 20 Guerrero Dep., Deposition Ex. 20). Guerrero has maps showing Doug, Zech, Kamal, and Moe as the supervisor. (*Id.* 83:1 - 23; Creps Decl., Ex. 20 Guerrero Dep., Deposition Ex. 20). The maps list four to six things for which may result in a backcharge and/or "removal from the job with no pay." (*Id.*; Creps Decl., Ex. 20 Guerrero Dep., Deposition Ex. 20). The project supervisor regularly visited the crew at project sites, to keep track of progress and to provide instructions on how they

*AFW*

wanted the job done. (Guerrero Dep. 58:25 - 59:19). The visits tended to be brief, ten to twenty minutes long, unless the supervisor was there to discuss changes to the project or difficulties that the crew encountered with the installation. (*Id.* 60:17 - 62:7). The supervisor would call Guerrero if there were any issues with a completed job. (*Id.* 84:20 - 85:2).

### 3. Jorge Humberto Rodriguez Zuniga

Jorge Humberto Rodriguez Zuniga ("Zuniga") worked for Westside doing patch work, initially at an hourly wage of $8.50 but later received a raise to $9.50 per hour. (Creps Decl., Ex. 21 Zuniga Dep. 15:4 - 16:18). Zuniga was paid in cash by a person named Doug. (Zuniga Dep. 17:25 - 18:3-7). Westside employees identify Doug Bennett as a Westside supervisor. (Creps Decl., Ex. 18 pp. 14-28). Mr. Bennett has not filed a declaration in this case.

### 4. Mario Alberto Luna Pava

Mario Alberto Luna Pava ("Luna") was paid by check when he first started working for Westside in the 1990s, but was later paid in cash. (Creps Decl., Ex. 19 Luna Dep. 22:25 - 23:11). Luna stopped working for Westside in 2004. (Luna Dep. 64:13-19).

## III. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(c). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of

*AFW*

a genuine issue of material fact, the non-moving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A non-moving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court may only consider admissible evidence in ruling on a motion for summary judgment. FRCP 56(e) (2008); *Orr*, 285 F.3d at 773. The court must view the evidence in the light most favorable to the non-moving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sandkovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the non-moving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FRCP 56(e). The "mere scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

//

//

*AFW*

# IV. Analysis

## A. Statute of Limitations

The Secretary's unopposed motion to dismiss all claims for back wages earned before December 1, 2004, was granted, with prejudice, on March 16, 2010. (Docket No. 107). Therefore Defendants' motion for summary judgment is DENIED as moot to the extent that they seek summary judgment on the Secretary's claims for willful violations.

However, the statute of limitations for FLSA actions is three years for "willful" violations; for "non-willful" violations the statute of limitation is two years. 29 U.S.C. § 255(a); *Dent v. Cox Commc'ns Las Vegas, Inc.*, 502 F.3d 1141, 1144 (9th Cir. 2007). The Secretary alleges both willful and non-willful violations of the FLSA. Whether an FLSA violation is "willful" is a mixed question of law and fact. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003) (internal citation omitted). To show that Defendants willfully violated the FLSA, the Secretary must prove that Defendants "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003) (*citing McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). The determination of willfulness is within the province of the trier of fact. However, whether the statute of limitations has run on a plaintiff's claim is a purely legal issue. *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Aloha Airlines, Inc.*, 790 F.2d 727, 733 (9th Cir. 1986). Therefore, Defendant's motion is GRANTED to the extent that the Secretary may recover damages only for non-willful claims accruing after December 1, 2005.

## B. Shirine Salem

The Secretary's unopposed motion to dismiss Ms. Salem as a defendant, with prejudice, was

*AFW*

granted March 16, 2010. (Docket No. 107). Therefore Defendants' motion for summary judgment for this defendant is DENIED as moot.

### C. Claims for Testifying Claimants

#### 1. Dismissed Claimants

The Secretary's motion to dismiss, with prejudice, the claims for back wages asserted on behalf of Carmen, Bernabe, Mendoza, Ramirez, Ramos, and Sepulveda was granted on March 16, 2010. (Order, Docket No. 107). Therefore Defendants' motion for summary judgment with regard to the claims for these individuals is DENIED as moot.

#### 2. Francisco Ramirez, Luis Umberto Rodriguez, Jose Mondragon Gaspar

Defendants rely on excerpts of the deposition testimony of these three claimants as proof that these claimants are not Westside employees. The Secretary relies on this same deposition testimony as proof that these claimants are indeed Westside employees. However, as described in Section I above, Defendants submitted their deposition excerpts without the cover sheet showing the deponents' names, the name of the action, or the reporter's certificate, and the Secretary submitted her deposition excerpts without the reporter's certificate. Therefore, the evidence offered by the parties is not properly authenticated and inadmissible. Defendants have not cited any authority for why this evidence otherwise should be admitted, and the court is aware of none. There is no admissible evidence available to the court to resolve the factual dispute between the parties. Therefore Defendants' motion is DENIED with respect to these three claimants.

#### 3. Sabas Hernandez Fernandez

The record shows that Sabas Hernandez Fernandez did not work for Westside in 2004, 2005, or 2006. Mr. Hernandez began working for Westside in March of 2008. He denies that he is owed

Page 26 - OPINION AND ORDER

*AFW*

back wages and further denies that he has ever claimed that he is owed back wages. He does not want the Secretary to pursue any claim on his behalf. The Secretary has not presented any admissible evidence to substantiate the claim asserted on behalf of Mr. Hernandez, thus Defendants' motion is GRANTED with respect to Mr. Hernandez.

### 4. Jose Gaspar

Defendants move for summary judgment with regard to Jose Gaspar on grounds that he has twice failed to appear for his deposition despite being properly served with a subpoena. Defendants cite no authority in support of their argument that a claimant may be dismissed from this action simply for failing to appear for his deposition. Rather, Jose Gaspar falls within the class of non-testifying claimants, and the claim brought on his behalf is addressed within the court's opinion on that issue. Therefore Defendants' motion for summary judgment as to this claimant individually is DENIED.

### 5. Mario Alberto Luna Pava

The record shows that while Mario Luna was once a Westside employee, he stopped working for Westside in 2004. At oral argument, Mr. Vadnal acknowledged that Luna's deposition testimony directly contradicts his previous interview statement to Clark, and that based on his sworn deposition testimony there is no evidence supporting a claim for Luna. Therefore, the Secretary is no longer pursuing any claim on behalf of this individual, as indicated by the Secretary's omission of this claimant from the Supplemental Exhibit A filed with the Secretary's first and second motions to amend. Therefore Defendants' motion for summary judgment is GRANTED as to Mario Luna.

### D. *Claims for Non-Testifying Claimants*

Defendants argue that summary judgment is appropriate on all claims brought on behalf of

*AFW*

non-testifying claimants. The plaintiff in an FLSA action bears the burden of proving as a matter of just and reasonable inference that he or she performed work for an employer, and was not properly compensated. *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946) (superseded by statute on other grounds)). Once the plaintiff proves a prima facie case, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference drawn by plaintiff's evidence. *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986); *see also Chao v. Akron Insulation & Supply, Inc.*, 184 Fed.Appx. 508, 510 (6th Cir. 2006). Put succinctly, the issue regarding non-testifying claimants is two fold. First, the court must determine whether the claimants Westside are employees. If so, the court must determine whether the evidence is sufficiently representative of the non-testifying claimants.

Defendants argue that the Secretary's claims on behalf of non-testifying claimants are subject to summary judgment for several reasons. First, Defendants argue that as a threshold issue, under the economic realities test, the Secretary cannot show that the claimants are Defendants' employees. Second, Defendants argue that the Secretary's claims are so highly individualized that no claim is representative of any other claim. Third, Defendants argue that even if there are sufficient commonalities between the claims, the claimants who have testified are not sufficiently representative of the non-testifying claimants. Finally, the Defendant argues that the Secretary's errors, such as identifying claimants later proven to be properly paid Westside employees and calculating wages without full information on a potential claimant's absences or vacations, renders all other claims suspect. The court notes that while there are instances in the record of errors by the Secretary in identifying some of the claimants or their jobs and work hours, these errors are not

*AFW*

dispositive of the Secretary's claims and instead bear on the credibility of those claims. The court addresses the threshold issue of the economic realities test first, and the two remaining arguments in turn.

### 1. The Economic Realities Test

The Supreme Court and the Ninth Circuit have consistently found that the central purpose of the FLSA is to enact minimum wage and maximum hour provisions designed to protect employees. *See, e.g., Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981); *Adair v. City of Kirkland*, 185 F.3d 1055, 1059 (9th Cir. 1999). The FLSA's definition of employee has been called the " 'broadest definition that has ever been included in any one act.' " *U.S. v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945) (quoting 81 Cong. Rec. 7,657 (1938) (statement of Sen. Black)). " 'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). " 'Employer' includes any person acting directly or indirectly in the interest of an employer . . . ." Id. § 203(d). The Ninth Circuit has held that the FLSA definition of "employer" is not to be limited to its common law concept, but "is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Boucher v. Shaw*, 572 F.3d 1087, 1090-91 (9th Cir. 2009) (citing *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999) (internal quotation marks and citations omitted)). "The touchstone is the 'economic reality' of the relationship." *Id.* (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

Courts have generally undertaken the economic reality analysis in one of two contexts: disputes over whether the plaintiff is an independent contractor or an employee, and disputes over whether or not a defendant is a joint employer. The parties do not address this distinction, but neither test is perfect in this case. Defendants argue that the claimants are employees of third party

Page 29 -  OPINION AND ORDER

*AFW*

subcontractors, not that they are independent contractors; meanwhile, the Secretary argues that Defendants are the sole employer, not that they are a joint employer. However, two things are true: if defendants are not a joint employer, then they are not an employer at all; also, if the claimants are independent contractors, then they are not Defendants' employees.

   a. Joint Employer

   Two or more employers may jointly employ someone for purposes of the FLSA. *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 539 (1985) (citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973)). All joint employers are individually responsible for compliance with the FLSA. 29 C.F.R. § 791.2(a) (1981). Where the dispute regards whether a defendant is a joint employer, the relevant factors include whether the defendant (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Bonnette*, 704 F.2d at 1470. These factors are neither exclusive nor exhaustive, rather, a court should consider all factors "relevant to the particular situation" in evaluating the "economic reality" of an alleged joint employment relationship. *Id. See also Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997) (applying *Bonnette* to a Migrant and Seasonal Agricultural Worker Protection Act claim); *Moreau v. Air France*, 356 F.3d 942, 950-52 (9th Cir. 2004) (applying *Bonnette* and *Torres-Lopez* to Family Medical Leave Act claim). "The *Bonnette* factors are properly applied where an individual is clearly employed by one of several entities and the only question is which one." *Morgan v. F.T. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994) (declining to apply the *Bonnette* factors to determine whether an inmate was "employed"). Other relevant factors include

Page 30 -  OPINION AND ORDER                                          *AFW*

(1) whether the service rendered requires a special skill; (2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes; (3) whether the premises and equipment of the employer are used for the work; (4) whether the work was piecework and not work that required initiative, judgment or foresight; (5) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill; (6) whether there was permanence in the working relationship; and (7) whether the service rendered is an integral part of the alleged employer's business. *Torres-Lopez*, 111 F.3d at 639. The *Bonnette* economic reality factors are applicable in circumstances of "vertical" joint employment, that is, where a company has contracted for workers who are directly employed by an intermediary company. *A-One Med. Servs., Inc.*, 346 F.3d at 917.

The parties dispute whether the claimants are Westside's employees, or employees of subcontractors who do work for Westside. Defendants argue that, in conformity with industry practice, Westside engages subcontractors to provide the labor to complete certain construction projects. The Secretary argues that the alleged "subcontractors" are an artificial construct operating as an illusory barrier between Westside and its labor force to shield Westside from its obligations under the FLSA. The analysis occurs in a vacuum, since no subcontractor has been identified and joined to this action as the actual employer. However, this court may still evaluate whether Defendants are joint employers under the *Bonnette* test.

### 1) Power to hire and fire

The only evidence on the record that Defendants exercised any power to hire or fire any claimant in this case is Israel Ayala's testimony that when he first went to Westside in 2001 looking for work, he spoke to Mr. Mohsen, who directed him to a person named Vega or Vera, and that

Page 31 - OPINION AND ORDER

*AFW*

Ayala began doing work on Westside projects from that date. The record is silent on who this person is, and there is no other evidence that any claimant in this action was hired or fired by Defendants. Martin Guerrero testified that he went directly to Ayala to ask for work, and became a member of Ayala's crew that way. Both Guerrero and Ayala testified that the persons working on their work crews fluctuated, depending on who needed work, who had work, and how much work was available. Guerrero testified that when he formed his own work crew, he did so at his own initiative, not after consulting with or getting permission from anybody else. This evidence weighs in favor of finding that Defendants are not joint employers.

### 2) Supervision and control

There is no evidence that Defendants told the laborers when to report to work, when to take breaks, when their workday ended, what days to work, or whether they were free to attend to personal business during the day. Defendants did, however, control which project sites the work crews are assigned to, control all decisions about what materials are used for the project, provide those materials, and require laborers to track their work on sheets provided by Westside and to turn in the sheets for payment. Westside supervisors regularly visited the project sites to provide supervision and instruction. However, these visits were brief, lasting only 10 or 20 minutes, and were not daily occurrences. There is no evidence that Defendants controlled the formation of or participation in work crews. There is evidence that Westside reserved the right to backcharge for work done incorrectly and retained the right to remove laborers from a project, without pay, under certain circumstances. Viewed in the light most favorable to the non-moving party, this factor weighs in favor of finding that Defendants are joint employers.

//

*AFW*

### 3) Rate and method of payment

There is some evidence that claimants negotiated their rate of pay directly with Westside employees, and also sometimes resolved disputes regarding their pay directly with Westside employees. There is also some evidence, albeit disputed, that Westside employees paid claimants and controlled their method of pay. There is also evidence that the claimants received their pay from third persons who were not Westside employees. However, viewed in the light most favorable to the Secretary, this factor weighs in favor of finding that Defendants are joint employers.

### 4) Employment records

There is evidence that Westside maintains employment records: Ms. Salem testified that she maintains them, subject to Mr. Salem's supervision. References have been repeatedly made to the existence of these records, specifically the Secretary's refusal to review them. Defendants acknowledge that some claimants are Westside employees, and have moved for summary judgment with regard to several individual claimants on grounds that Westside's payroll records conclusively show that these claimants have been properly paid. It is unclear whether these are the only claimants who appear in Westside's employment records. What is clear is that the parties agree that most of the claimants do not appear in Defendants' employment records; the parties disagree only as to the reason why this is. There is also evidence that Defendants required the claimants to track their work on time sheet worksheets, and that the claimants were required to turn these documents in to Westside. Viewed in the light most favorable to the non-moving party, this factor weighs in favor of finding that Defendants are joint employers.

### 5) Other factors

Many of the other factors applied in a joint employer analysis are also used in the analysis

*AFW*

to determine whether a worker is an independent contractor or an employee. Those factors are therefore described in that analysis, below.

### 6) Conclusion

Based on the analysis of the economic reality factors, the court concludes that there is sufficient evidence for a reasonable jury to find that Defendants' were joint employers.

### b. Independent Contractor vs. Employee

Where the dispute regards whether a plaintiff is an independent contractor or an employee, the relevant factors include (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979) (footnote omitted)). "These factors are a summation of what the Supreme Court has deemed relevant." *Id.* at 1370 n. 5 *(citing Bartels v. Birmingham*, 332 U.S. 126, 130 (1947); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *United States v. Silk*, 331 U.S. 704, 716 (1947)). Whether an employer-employee relationship exists is not dependent upon "isolated factors but rather upon the circumstances of the whole activity." *Boucher*, 572 F.3d at 1091 (citing *Rutherford Food Corp.*, 331 U.S. at 730). While developed and applied in the context of disputes over whether a claimant is an independent contractor or an employee, the test may still be applied here for the purpose of determining whether the claimants are "employees."

AFW

### 1) Control

There is no indication that Westside tells the laborers when to report to work, when to take breaks, when their workday ended, or whether they were free to attend to personal business during the day. With the exception of Ayala's testimony, there is no evidence that Defendants control the formation of or participation in work crews. There is evidence that Westside reserves the right to backcharge for work done incorrectly and retains the right to remove laborers from a project, without pay, under certain circumstances. Finally, the laborers worked without direct supervision most of the time. These factors weigh against finding that Defendants exercised control over the laborers.

However, the fact that the laborers are not supervised in detail at all times does not necessarily mean they are not "employees." *E.g. Crowd Mgmt. Servs., Inc. v. U.S.*, Nos. 92-36726, 92-36776, 1994 WL 481183, at *2 (9th Cir. 1994) (control found where defendant's supervisors instructed workers on which areas to manage, tasks to be done at a given location, and made regular rounds to monitor performance) (citing *Silk*, 331 U.S. at 718). *Accord, Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 578-80 (D. Md. 2008) (control found where plaintiff painters decided how to apply paint, but defendant directed them to specific work sites, provided all supplies, dictated number of coats, set schedule, and trained inexperienced workers); *Molina v. S. Florida Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1285 (M.D. Fla. 2006) (finding control requires showing that plaintiff controls a meaningful part of the business to such a degree that she stands as a separate economic); *Baker v. Barnard Constr. Co., Inc.*, 860 F. Supp. 766, 771 (D. N.M. 1994) ("A laborer on a construction site, who is told where and when to dig, does not exhibit characteristics of an independent contractor if the company does not actually tell him how to use a shovel"), *aff'd sub nom. Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436 (10th Cir. 1998). Defendants

Page 35 - OPINION AND ORDER

*AFW*

controlled all decisions about what materials are used for the project and provides those materials. which project sites work crews are assigned to, and Westside supervisors regularly visited the job sites to provide supervision and instruction. Laborers were required to track their work on sheets provided by Westside and to turn the sheets in for payment. Laborers negotiated for higher rates of pay directly with Westside employees. All of these factors weigh in favor of finding that Defendants exercised control over the laborers. Viewed in the light most favorable to the non-moving party, this factor weighs in favor of employee status.

2) Amount of Investment

In their depositions, Guerrero and Ayala both testified they had their own tools and used their own vehicles to get to work. However, there is no indication that the vehicles were in some way necessary for to the work done or purchased as a necessary requirement of the job. The use of a personal vehicle for the purpose of transportation to and from work is unexceptional and adds nothing to the analysis of this factor. Likewise, there is no evidence from which the court can adduce the significance of these claimants having and using their own tools. Neither side has offered evidence demonstrating the relative investments made by either party in relation to the business at hand. Accordingly, the court cannot make an accurate comparison of the investments made by the parties, and is therefore unable to make a determination on this factor.

3) Opportunity for Profit and Loss

There is evidence that laborers are paid either a fixed hourly wage or on a piece rate basis, depending on what job they are doing. Where workers are paid a fixed hourly wage with no opportunity for commission or bonus, this weighs in favor of employee status. *Montoya*, 589 F. Supp. 2d at 580 ("[w]here the putative employee's work is, by its nature, time oriented, not project

Page 36 - OPINION AND ORDER

*AFW*

oriented, courts have weighed [this factor] in favor of employee status"). Where workers have the ability to enhance their earning capacity by improving their technique, allowing them to complete more work with fewer errors, this factor weighs in favor of independent contractor status. *Chao v. Mid-Atlantic Installation Servs., Inc.*, No. 00-2263, 2001 WL 739243, at *2 (4th Cir. July 2, 2001). Here, there is evidence that laborers are paid differently according to their job. Thus this factor weighs in favor of employee status for hourly workers, and in favor of independent status for workers paid on a per-project basis.

### 4) Degree of Skill Required

There is no evidence that the laborers performed highly specialized work requiring a significant degree of skill, training, or education. Even if an individual has specialized skills, that is not determinative of independent contractor status where the individual does not use those skills in an independent fashion. *Baker*, 137 F.3d at 1442-43 (where welders were highly skilled employees but exercised no independent judgment on the job, and defendants made no showing that they sought out the most skilled rig welders available or negotiated pay depending on level of skill, court found level of skill was not indicative of contractor status). Defendants' only argument on this factor is that Guerrero testified that it takes four-to-five months of training to learn how to do drywall. By itself, this is not compelling evidence of independent contractor status. Without more, this factor weighs in favor of employee status.

### 5) Integration of Workers's Services Into Defendants' Business

It is not disputed that the jobs the laborers perform are integral to Defendants' business. Defendants are, after all, in the business of installing drywall. This factor turns on whether the service the worker performs is integral to the business, not on whether a worker is individually

*AFW*

integral. *Montoya*, 589 F. Supp. 2d at 581. Laborers are scheduled to do work on a sequential basis: sheetrock is installed after insulation, taping is done after the sheetrock is installed, patchwork happens later, and so forth. *See, e.g. Baker*, 137 F.3d at 1443 (welder's work is important, indeed integral, to pipeline construction work); *Crowd Mgmt. Servs.*, 1994 WL 481183, at *2 (furnishing workers to provide security integral to crowd control). These are all necessary components of Defendants' business, thus this factor weighs in favor of employee status.

### 6) Permanency

The evidence shows that laborers began and ended their employment in at-will status. Laborers took on one project at a time, finishing one before moving on to another, and tended to work exclusively on Westside projects. Most laborers stayed with their crews for several years, even if they were intermittently absent. However, the work crews freely solicited work from other sources besides Westside during the slow times of the year. Overall, this factor weighs in favor of independent contractor status.

### 7) Conclusion

Based on the analysis of the economic reality factors, the court concludes that there is sufficient evidence for a reasonable jury to conclude that the claimants were Defendants' employees, not independent contractors.

## 2. Commonality Among the Claims

Defendants contend that each claim is individualized to such an extent as to render it non-comparable to any other claim. Defendants argue that there is no consistency in claim date ranges, method of compensation, wage rates, and hours worked. Defendants point to Exhibit 17 in support of their argument. They do not provide specific cites for any argument, but rather refer to Exhibit

*AFW*

17 generally. Examining Exhibit 17, the court finds that Defendants' argument fails. It is true that, looking at the summary documents, the claims range from $70.00 to $46,378. However, reviewing the underlying individual claim worksheets shows that the disparity is superficial. Grouping the individual claimants by their "occupation," as noted on the worksheets, the court finds that there are six different groups represented (drywall installer, drywall laborer, insulation, patchwork, taper, mechanic) and two additional undefined categories (payroll, and those for whom no occupation is listed). Within each group, there is sufficient evidence of commonality among the individual claims.

    a. Drywall Installers

    For the thirteen "drywall installer" claimants (Exhibit 17 pages 5, 12-17, 19, 48-50, 55, 59, 63, 65), six claims range between $20,790.90 and $25,913.68; four claims range between $12,154.68 and $17,111; two claims are identical at $6,456.24; and the last claim is for $1,056.68. Reviewing these worksheets in detail shows that with two exceptions (Jesus Villa-Borroel, who shows an hourly wage, and Fontino Quiroz Fajardo, who shows a lump sum), the claim calculation is based on a fixed weekly or semi-monthly wage. When the eleven fixed wage claims are compared on a per-week basis, nine fall within a variable range of only $46. Israel Ayala is among these eleven claimants, and his deposition testimony accounts for four additional claimants in this group: Sergio Ayala, Rogelio Ayala, Daniel Solano Ayala, and Augustin Cervantes Ochoa. The other two, for Sergio Ayala and Martin Ayala Guerrero, are the lowest and the highest, respectively, among this group; any discrepancies created by these claims can be resolved by referencing Guerrero's deposition testimony and both his and Israel Ayala's testimony regarding Sergio Ayala, as they both worked with him. The hours worked per week range from lows of 57 and 62 hours (for the same single claimant over two periods of time) to a high of 68 hours (two claimants), with nine claimants

*AFW*

working 66 hours. The claims show weeks worked ranging from a low of 9 to a high of 153, for time worked between September 25, 2004, and September 21, 2007.

### b. Drywall Laborers

For the eight "drywall laborer" claimants, three claims range between $20,913.20 and $26,766.01; two claims are identical at $14,092.50; another two are identical at $8,726.84; the last outlying claim is for $5,716.68. Three of these claims are calculated by an hourly wage; Jorge Humberto Rodriguez Zuniga falls within this group. In his deposition Zuniga testified that he does patch work. His hourly wage is consistent with those shown for the three identified "patchwork" claimants. While neither party relies on it here, the court notes that this evidence is also consistent with the evidence submitted by both parties for another patchworker, Sabas Fernandez Hernandez (whose Exhibit 17 worksheet does not show an occupation). The record does not show whether the other two hourly wage claimants also do patchwork. The remaining five "drywall laborer" claims show fixed weekly or semi-monthly wages. Four of the five claim identical weekly wages, while the fifth is several hundred dollars lower; however, all five fall squarely within the range of the nine "drywall installer" claims discussed above. Four claims show 65 or 65.5 hours worked per week; the other four show 59.5 hours for the same 56 week period, and two of the four assert 66 hours for another sixteen week period. The weeks worked range from a low of 21 to a high of 106, for time worked between September 25, 2004, and September 22, 2007.

### c. Insulators

For the four "insulation" claimants, three claims range between $10,070.60 and $12,786.80, while the fourth is for $22,963.79. Two claims are calculated from a fixed semi-monthly wage, one is calculated on an hourly basis, and the fourth and final claim is calculated from gross wages. Two

*AFW*

claims show 58 hours worked per week, while the other two show 65 and 65.5. The weeks worked range from a low of 45 to a high of 89, for time worked between September 25, 2004, and June 16, 2007. Three of these four claimants have been deposed (Alan Garcia Bogarin, Carlos Martinez Sanchez, and Jorge Jimenez Naranjo). The Secretary submitted improperly authenticated and therefore inadmissible deposition excerpts for Bogarin and Sanchez, and did not submit evidence for Naranjo; Defendants have not submitted any deposition excerpts for these claimants.

### d. Patch Workers

For the three "patchwork" claimants, the claims range from $9,761 to $14,981.12. For the five "taper" claimants, two claims are identical at $9,789.40, another two are identical at $3,909.65, and the last claim is an outlier at $654.15. Each claim is based on an hourly wage, ranging from $7.50/hr to $8.00/hr. Hours worked per week range from 55.5 to 62. The difference in claim amount is accounted for by the total number of weeks worked, which ranges from 43 to 84 for time worked between February 5, 2005, and October 7, 2006. As noted above, this is consistent with the deposition testimony of Jorge Humberto Rodriguez Zuniga. The Secretary submitted an improperly authenticated and therefore inadmissible deposition excerpt for one of the three claimants, Juan David Gonzales Torres.

### e. Tapers

Four of the five "taper" claimants show fixed $600 bi-monthly wages, 55 hours worked per week, two weeks worked per month. The four claims are paired–two claims show 51 weeks worked between September 25, 2004 and September 30, 2006; the other two show 17 weeks worked between February 4, 2006, and September 30, 2006. All four allege that they were not paid for same the three weeks ending September 16, September 23, and September 30; the fifth claim seeks back wages only

Page 41 -  OPINION AND ORDER

*AFW*

for this same three week period.  The court notes that both parties have submitted deposition testimony for one of these four claimants, Jose Mondragon-Gaspar; however as described above, this evidence was improperly authenticated and inadmissible, thus the court does not consider that evidence here.

### f.  Claimants Without an Identified Occupation

Even the claimants whose occupation is not identified show commonality.  Two claims are identical at $3,182.28 claimed in gross wages, for 66 hours/week for 12 weeks between June 4, 2005, and August 27, 2005.  Three claims are identical at $6,456.24, for fixed bi-weekly wages, 68 hours/week for 36 weeks between September 2, 2006, and May 5, 2007.  Another three claims are identical at $8,068.93, for fixed bi-monthly wages, 63 hours/week for 40 weeks between June 3, 2006, and March 3, 2007.  The six fixed hourly or semi-monthly wage claims fall within the same $46 variable range as the nine "drywall installer" claimants above.  The ninth claim in this group, an outlier at $16,656.64, is for Sabas Fernandez Hernandez.  As described above, the court has received extensive evidence from both parties for this claimant who testified that he is a patchworker and is compared above to the identified claims for that group.

### g.  Payroll Claimants

Six of the nine claims identified as "payroll" claimants are for individuals who the Secretary has voluntarily dismissed from this action, and are noted where relevant above.  The three remaining "payroll" claims are entirely inconsistent with each other, and are discussed below.

### h.  Unique Claims

Four claims remain:  three "payroll" claimants (Enrique Sanchez, Virgilio Martinez, and Walter Holliman) and a single "mechanic" claimant (Jorge Rodriguez-Castillo).  The claim for

*AFW*

Enrique Sanchez is identical in every respect to two claims asserted for two "drywall installer" claims (Rigoberto Azamar and Cruz Sanchez). The claim for Virgilio Martinez is for a different date range but otherwise comparable to Fontino Quiroz Fajardo, a "drywall installer;" however, Fajardo's claim is unique among the identified "drywall installer" claims. The Secretary also asserts a $70.00 claim for seven hours of unpaid overtime for Walter Holliman, for whom no occupation is listed. Last, the Secretary asserts a claim for $46,378 for Jorge Rodriguez-Castillo, the only claimant identified as a "mechanic" and the only claimant with an hourly wage of $20/hr

### i. Conclusion

For the reasons described above, the court finds that, with the exception of the claims asserted on behalf of Walter Holliman and Jorge Rodriguez-Castillo, there is sufficient commonality among the claims asserted within each identified occupation to preclude a finding that the claims asserted are not "representative." The variation between the occupations is consistent with Defendants' argument that Westside employs many different workers, in different jobs, with different skill sets, and correspondingly different rates and methods of pay. While there is also variation among the claimants within identified occupations, the court notes patterns of grouping, that is, two or more claims within an occupation are either identical or highly comparable, which is consistent with the described "work crews" of anywhere from two to six or eight workers. Therefore, if there is sufficient representative evidence to eastablish a reasonable inference that the claimants within each group were not properly compensated for work performed.

### 3. Representative Capacity of Testifying Claimants

Defendants argue that even if there is sufficient commonality between claims, the Secretary has not offered sufficient evidence to establish that the testifying claimants are representative of the

*AFW*

non-testifying claimants. The Secretary bears the burden of proving that the claimants on in this FLSA action were not properly compensated for work performed. *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998) (*citing Anderson v. Mt. Clemens Pottery Co.*, 328 US 680, 686-87 (1946)). The burden is initially on the plaintiff to produce sufficient evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Mt. Clemens*, 325 U.S. at 687. The burden then shifts to the employer, and if the employer fails to produce "evidence of the precise amount of work performed or evidence to negative the reasonableness of the inference to be drawn from the employee's evidence . . . [t]he court may then award damages to the employee[s], even though the result be only approximate." *Id.* at 687-88. "Damage awards for unidentified employees are within the scope of the FLSA, so long as a preponderance of the evidence established the existence, work done, and wages of these employees." *Am. Waste Removal Co. v. Donovan*, 748 F.2d 1406, 1410 (10th Cir. 1984) (upholding damages award of back wages and benefits for unnamed, unlocated employees). "Such awards benefit the public interest by depriving the employer of any benefits accrued as a result of its illegal pay practices and by protecting those employers who comply with the FLSA from unfair competition from those employers that do not." *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657-58 (6th Cir. 1994) (*citing Donovan v. Grantham*, 690 F.2d 453, 456 (5th Cir. 1982)).

Employee testimony, documentary evidence, and expert testimony are appropriate methods of making a prima facie showing of a pattern or practice of unpaid time and wages. The Secretary's burden, while minimal, is not non-existent. However, the clear weight of authority shows that there is no mathematical formula for satisfying the burden. *E.g. McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (five employees sufficiently representative of 28 claimants); *see also*

Page 44 -  OPINION AND ORDER

*AFW*

*Grochowski v. Phoenix Constr.*, 318 F.3d 80, 87-88 (2nd Cir. 2003) (damages denied where claimants failed to submit any evidence on their behalf, or relied on testimony of co-plaintiffs, which was insufficient to provide a basis for determining the hours and wages of the non-testifying plaintiffs); *Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 67 (2nd Cir. 1997) (39 employees, representing five job categories, insufficiently representative of 1,500 claimants); *Reich v. Southern Md. Hospital*, 43 F.3d 949, 951 (4th Cir. 1995) (54 employees insufficiently representative of 3,368 employees); *Secretary of Labor v. DeSisto*, 929 F.2d 789, 793 (1st Cir.1991) (single employee inadequately representative of 244 employees holding variety of positions at different locations); *Donovan v. Bel-Loc Diner Inc.*, 780 F.2d 1113, 1115 (4th Cir. 1985) (22 employees sufficiently representative of 98 waitress-employees); *Castillo v. Givens*, 704 F.2d 181, 195 (5th Cir. 1983) *cert. denied* 464 U.S. 850 (1983) (13 migrant farm laborers sufficiently representative of 39 workers); *Donovan v. Williams Oil Co.*, 717 F.2d 503 (10th Cir. 1983) (19 station attendants sufficiently representative of 34 employees at 9 different stations); *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) (12 employees, including one from each of the 6 gas stations, sufficiently representative of all employees); *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982) (6 employees from 6 restaurants, accompanied by stipulations that 20 employees would testify similarly, sufficiently representative of 246 employees at 44 restaurants); *Donovan v. New Floridian Hotel Inc.*, 676 F.2d 468 (11th Cir. 1982) (23 claimants sufficiently representative of 207 claimants in four different job categories, but insufficiently representative of another 56 claimants); *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (16 employees sufficiently representative of 37 employees). As these cases illustrate, there is no

*AFW*

set mathematical formula for determining the number of claimants who may represent a class.[3]

a. Admissible Evidence

Defendants argue that the admissible evidence is insufficient to be representative of a class of 52 claimants. The court first notes that the Secretary has dismissed six claimants from this action, leaving only 46 claimants remaining. Furthermore, as noted above the court has granted summary judgment with regard to Hernandez and Luna, leaving only 44 claimants remaining. These claimants worked in one of several job categories and the testimony need only be representative of the individuals within each category. The Secretary has submitted deposition testimony from Jorge Rodriguez Zuniga, a patcher, and Martin Ayala Guerrero and Israel Ayala Lugo, drywall installers. Guerrero and Ayala both testified that they worked with and have first hand knowledge of the hours worked and wages earned by as many as seven other claimants. Defendants' Exhibit 17 identifies three patchers in addition to Zuniga, and eighteen drywall installers/laborers in addition to Guerrero and Ayala. The court finds that the evidence offered by these testifying claimants is sufficient as a matter of proportional representation for identified drywall installers/laborers and patchworkers. The

---

[3] District court decisions follow the Circuit Courts of Appeal on this issue. *See Herman v. Davis*, 21 F. Supp. 2d 130, 133 (N.D.N.Y. 1998), *rev'd on other grounds*, 196 F.3d 354 (2nd Cir. 1999) (testimony of 40 witnesses, plus documentary evidence of 365 separate instances of conduct sufficiently representative of 956 claimants); *Reich v. Waldbaum, Inc.*, 833 F. Supp. 1037, 1041-42 (S.D.N.Y. 1993), *rev'd in part on other grounds*, 52 F.3d 35 (2nd Cir. 1995) (37 employees sufficiently representative of 262 employees working at 20 different grocery stores); *McLaughlin v. DialAmerica Marketing, Inc.*, 716 F. Supp. 812, 824 (D.N.J. 1989) (43 researchers sufficiently representative of 393 employees); *Dept. of Labor v. Solid Waste Servs., Inc.*, 733 F. Supp. 895, 910 (E.D. Pa. 1989) (65 claimants sufficiently representative of 300 person class); *Marshall v. Brunner*, 500 F. Supp. 116 (W.D. Pa. 1980), *aff'd in part and rev'd on other grounds*, 668 F.2d 748 (3rd Cir. 1982) (48 employees sufficiently representative of 93 employees); *Marshall v. R&M Erectors Inc.*, 429 F. Supp. 771, 777 (D. Del. 1977) (employees who gather in central location, leave together, work together, and return together sufficient to prove prima facie case that members of same job classification work same number of hours).

Page 46 - OPINION AND ORDER

*AFW*

court does not address the weight of the evidence, as it is for the trier of fact to determine whether these witnesses are sufficiently credible to support the claims made for non-testifying claimants. *Chao v. Pacific Stucco, Inc.*, No. 2:04-CV-0891-RCJ-GWF, 2006 WL 2432862, at *4 (D. Nev. 2006) (*citing Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994)).

### b. Inadmissible Evidence

Defendants argue that summary judgment the Secretary has offered no admissible evidence that the testifying claimants may fairly represent the tapers, insulation installers, and other workers. At trial, the Secretary bears the burden of proving that the evidence presented is sufficiently representative of the non-testifying claimants, therefore Defendants need only point out the absence of evidence to support the Secretary's case to prevail at summary judgment. *Farrakhan v. Gregoire*, 590 F.3d 989, 1003 (9th Cir. 2010) (*citing Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc)). The Secretary relies on the deposition testimony of ten claimants to prove that the testifying claimants may fairly represent the non-testifying claimants in this case. However, as noted above in Section I, the only properly authenticated and thus admissible deposition excerpts submitted by the parties in this case were for Martin Guerrero and Israel Ayala, drywall installers, and Jorge Zuniga, a patcher. The deposition excerpts for Francisco Ramirez Ojeda, Luis Rodriguez Jimenez, Jose Mondragon Gaspar, Carlos Martinez Sanchez, Jesus Christian Avila, Alan Garcia Bogarin, and Juan Gonzales Torres, were not properly authenticated, and therefore inadmissible as evidence at summary judgment under the Ninth Circuit's *Orr* opinion. Because the record is devoid of evidence proving that the Secretary can prevail in her claims for claimants working in any occupation other than drywall installer/laborer or patcher, summary judgment is appropriate for all claimants not working in one of those two occupations.

*AFW*

c.  Conclusion

For the reasons above, Defendants' motion is DENIED with regard to claimants working as drywall installers, drywall laborers, and patchworkers, and GRANTED with regard to all other claimants.

*Motion to Amend*

I.  Facts

This court issued a pretrial scheduling order October 1, 2008, requiring, *inter alia*, that all pleadings pursuant to Rule 7 and Rule 15 be filed within 120 days, and that discovery be completed by January 29, 2009.  (Docket No. 2).  The discovery deadline was subsequently extended three times on motion of one or both of the parties, with the final deadline set as October 1, 2009.  (Docket Nos. 16, 37, 67).  No motion was ever filed requesting to extend the deadline for filing amended pleadings to correlate with the extended discovery deadline.

The Secretary filed a motion to amend the First Amended Complaint on October 1, 2009. (Docket No. 88).  A document titled "Supplemental Exhibit A" is attached, ostensibly to replace the original Exhibit A naming the individual claimants in this action that was filed with the original complaint.  The Supplemental Exhibit A adds the following claimants:  Sergio Ayala Ramos, Chaquis, Oscar Correa Ojeda, Juan Carlos Correa, Eduardo, Marcos, Mayito, Reynaldo Mendoza, Felipe [sic] Rodriquez Jimenez, Geraldo Rodriquez Jimenez, Isauro Rodriquez Jimenez, Gerzain Sanchez Alejandrez, and Manuel Sanchez Alejandrez. Enrique Sanchez, who appears on the original Exhibit A, is listed twice on the Supplemental Exhibit A, apparently in error.

The Secretary filed a second motion to amend Exhibit A on March 15, 2010.  (Docket No. 103).  This motion seeks to add claimant Jose Mondragon Gaspar, who was inadvertently omitted

*AFW*

on the Supplemental Exhibit A, and further moves to add Leonel Ayala and Marcos Rodriquez. Karen Clark identified Leonel Ayala and Marcos Rodriquez as claimants when reviewing the deposition testimony of Martin Ivan Ayala Guerrero. (Declaration of Karen Clark ISO the Secretary's Second Motion to Amend Exhibit A of the Complaint ("Clark Decl. ISO 2nd Am. Mtn.") ¶ 2, Ex. A Guerrero Dep. 57:9-21, 65:8-14). On January 11, 2010, the Secretary provided Defendants with wage claim calculations for Marcos Rodriquez and Leonel Ayala had been computed and provided notice that a motion to add these claimants would be filed. (Declaration of Matthew L. Vadnal In Support of the Secretary's Second Motion to Amend Exhibit A of the Complaint ("Creps Decl. ISO 2nd Am. Mtn.") ¶ 4 & Ex. A).

## II. Legal Standard

Where the court has issued a pretrial scheduling order establishing a timetable for amending the pleadings, the pretrial order controls the subsequent course of the action and may be modified only upon a showing of good cause. FRCP 16(b); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294-95 (9th Cir. 2000); *Johnson v. Mammoth Recreations Inc.*, 975 F.2d 604, 609 (9th Cir. 1992); *see also, S & W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 535-36 (5th Cir. 2003) (agreeing with the First, Second, Eighth, Ninth, and Eleventh Circuits that Rule 16(b) trumps Rule 15(a) when a motion to amend comes after the deadline set forth in a scheduling order). Under Rule 16(b), a party must show good cause for not having amended its complaint before the time specified in the scheduling order expired. *Coleman*, 232 F.3d at 1294. The Rule 16(b) "good faith" standard considers primarily the diligence of the moving party. *Johnson*, 975 F.2d at 609. The district court's decision regarding the preclusive effect of a pretrial order will not be disturbed unless it evidences a clear abuse of discretion. *Id.* at 607.

*AFW*

III. Analysis

The Secretary argues that the first and second motions to amend Exhibit A to the Complaint should be granted under FRCP 15. Defendants respond that this case is subject to the FRCP 16 "good cause" standard, and that under that rule leave to amend should be denied. The Secretary's argument is based on the wrong legal standard. This case is subject to a pretrial scheduling order, therefore the motions to amend are governed by FRCP 16. The Secretary acknowledges the pretrial scheduling order, but contends that the motions to amend should be granted under FRCP 15; however, she offers no explanation or argument to explain why FRCP 15, and not FRCP 16, should be applied. As a result, none of the authority offered by the Secretary is useful to the court, and the court must undertake an independent analysis under the proper standard to determine whether any of the evidence or arguments raised by the Secretary provides a basis for granting leave to amend.

A. *The Secretary Fails to Satisfy the FRCP 16 "Good Cause" Standard*

The Secretary has filed two motions to amend. The first motion to amend was filed October 1, 2009, eight months after the January 29, 2009, deadline for filing amended pleadings had passed. The motion seeks to replace Exhibit A of the Complaint with a Supplemental Exhibit A, to add thirteen claimants discovered during discovery through deposition testimony taken in January, February, and August of 2009. There is no evidence that the Secretary provided notice to Defendants that the Secretary would seek leave to amend to add claims for these individuals. The second motion to amend was filed March 15, 2010, nearly fourteen months after the January 29, 2009, deadline had passed. This motion seeks to add two new claimants discovered during deposition testimony taken in January 2009, more that one year earlier. These claimants were not included in the Secretary's first motion to amend filed on October 1, 2009. On January 11, 2009, the Secretary provided

*AFW*

Defendants written notice of her intention file a motion to amend to add claims for these individuals.

"To demonstrate diligence under Rule 16's 'good cause' standard, the movant may be required to show the following: (1) that she was diligent in assisting the Court in creating a workable Rule 16 order; (2) that her noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding her diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference; and (3) that she was diligent in seeking amendment of the Rule 16 order, once it became apparent that she could not comply with the order." *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 608 (E.D. Cal. 1999) (internal citations omitted). The Secretary has failed on all three counts.

### 1. Creating the Scheduling Order

The Secretary argues that in FLSA actions it is common to discover additional claimants during the discovery process. Despite having discovered at least two additional claimants before January 11, 2009, the Secretary failed to alert the court that she anticipated filing motions to amend either during either the Rule 16 conference on December 10, 2008 (Docket No. 16) or the discovery status conference on August 5, 2009 (Docket No. 7). Parties anticipating possible amendments to their pleadings have an "unflagging obligation" to alert the Rule 16 scheduling judge of the nature and timing of such anticipated amendments in their status reports so that the judge can consider whether such amendments may properly be sought solely under the Rule 15(a) standard, and whether structuring discovery pertinent to the parties' decision whether to amend is feasible. *See Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1371 (1st Cir. 1991). If the Secretary was aware of those circumstances when she submitted her status report and yet said nothing about them, such an omission is not "compatible with a finding of diligence." *Johnson*, 975

Page 51 - OPINION AND ORDER

*AFW*

F.2d at 609. "A party who fails to assist the Rule 16 scheduling judge in 'fashioning workable programmatic procedures' must 'bear the reasonably foreseeable consequences for [her] failure to do so.' " *Jackson*, 186 F.R.D. at 608 *(citing In re San Juan Dupont Plaza Hotel Fire Litig.*, 111 F.3d 220, 227-28 (1st Cir.1997)).

Here, the Secretary never advised the court, before or after the court's scheduling order was entered, of the possibility that additional claimanst likely would be added. If it is common to discover new claimants during discovery in FLSA cases such as this one, as the Secretary argues, then no reason exists to excuse the Secretary's failure to seek a provision in the court's scheduling order allowing for later amendment or establishing a procedure for seeking to add claimants as they were discovered.

### 2. Complying with the Scheduling Order

The Secretary states that she assumed that each extension of the discovery deadline necessarily extended the deadline for filing amended pleadings was extended as well. In the case of her second motion to amend, the Secretary knew about the two new claimants *before* the deadline for filing amended pleadings had passed, yet waited nearly fourteen months before finally filing the motion to amend. "A litigant who ignores a case-management deadline does so at his peril." *Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998) (summary judgment motions filed eight and fifteen weeks after the deadline for filing dispositive motions expired denied as untimely, where no modification of the applicable deadline was requested); *Hussain v. Nicholson*, 435 F.3d 359, 367 (D.C. Cir. 2006) (failure of plaintiff's first attorney to conduct discovery in timely and diligent fashion did not constitute good cause for enlarging discovery deadline); *Provident Energy Assocs. of Montana v. Bullington*, No. 02-35798, 2003 WL 22301792, at *1 (9th Cir. Oct. 7, 2003)

*AFW*

(attorney's misreading of complaint insufficient to show good cause why leave to amend should be granted where motion was filed seven months past the filing deadline); *Schultz v. Wal-Mart Stores, Inc.*, No. 02-35169, 2003 WL 21518736, at *2-3 (9th Cir. May 8, 2003) (attorney's mistake regarding procedural requirements insufficient to show good cause why leave to amend should be granted where the motion was filed six months past deadline); *Turner v. Imperial Stores*, No. 95-56319, 1996 WL 738630, at **1 (9th Cir. Dec. 23, 1996) (attorney's failure to read complaint until seven months after it was filed defeated ability to show good cause why leave to amend should be granted to correct clerical errors and omissions). Thus, the Secretary has failed to prove that she has diligently complied with the court's scheduling order.

### 3. Seeking Timely Amendment of the Order

The Secretary has, to date, never requested that the scheduling order be amended to allow her to file a motion to amend. The Secretary offers no authority, and this court has found none, providing that an otherwise untimely motion may be considered timely due to a party's "reasonable assumption." In fact, courts have consistently reached the opposite conclusion. *E.g., Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 560 (S.D.Cal. 1999) (failure to diligently act upon information obtained from opposing party during discovery does not constitute good cause); *Carnrite v. Granada Hosp. Group, Inc.*, 175 F.R.D. 439, 448 (W.D.N.Y. 1997) (" 'inadvertence' or oversight is not good cause for purposes of Rule 16(b)"); *Tschantz v. McCann*, 160 F.R.D. 568, 572 (N.D. Ind. 1995) (failure to pay attention to discovery received does not constitute good cause). The Secretary argues only that filing an amended Exhibit A each time a new claimant was discovered would have been inefficient, not that it could not reasonably be done. The Secretary's subjective determination regarding efficiency does not supersede her objective duty of diligence. Once the

Page 53 - OPINION AND ORDER

*AFW*

Secretary recognized that amendments might be required due to information obtained through discovery, it was her responsibility to timely request an extension of the filing deadline.

B. *Prejudice*

The Secretary argues that the motion to amend should be allowed because Defendants cannot show that granting leave to amend will prejudice Defendants, and alternative that any prejudice may be cured by reopening discovery. A lack of prejudice to the non-moving party does not constitute "good cause." *Johnson*, 975 F.2d. at 609; *Searcy v. 3 Day Blinds Inc.*, No. 04-16673, 2006 WL 2255498, at *1 (9th Cir. July 28, 2006), *cert. denied*, 549 U.S. 1114 (2007). Here, allowing the amendment causes prejudice to Defendants.

The need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice resulting from a delayed motion to amend. *Lockheed Martin Corp. v. Network Solutions Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) (denying leave to amend where plaintiff considered amendment but waited until three months after the deadline passed to file the motion, the amendment relied on facts available to the plaintiff before the deadline, and the sole argument for granting the amendment was that it did not prejudice the defendant). *Accord, Canal Properties, LLC v. Alliant Tax Credit V, Inc.*, Nos. 05-15253, 05-15459, 2007 WL 579793, at *1 (9th Cir. Feb. 16, 2007) (denying leave to amend where discovery had closed and the time for dispositive motions had passed); *Roberts v. Arizona Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (denying leave to amend where the court found prejudice to the opposing party, discovery was virtually complete, and defendant's motion for summary judgment was pending before the court).

As in *Lockheed Martin*, the Secretary knew before the deadline for filing amended pleadings had passed that she intended to submit a motion to amend to add at least two claimants, but failed

*AFW*

to file the motion to amend until nearly fourteen months later, and then only after neglecting to include these claimants in the first motion to amend to add thirteen additional claimants. Discovery in this case closed on October 1, 2009, and the parties' dispositive motions are pending before the court. The Secretary suggests that the prejudice to Defendants, if any, may be cured by re-opening discovery to allow Defendants the opportunity to attempt to locate and subpoena the new claimants for deposition.

However, the prejudice to Defendants of allowing the motion to amend is significantly greater that that suggested by the Secretary. The deadline for filing amended pleadings passed without the Secretary filing an amended complaint or a motion to extend the deadline. Defendants had no reason to anticipate that the Secretary was still searching for additional claimants, and therefore had no reason to note when claimants giving deposition testimony mentioned the names of others with whom they worked. Had Defendants been on notice that amendments were forthcoming, or even contemplated, Defendants would have had the opportunity and the motive to question each claimant closely about any other individuals they named during their deposition. However, once the deadline for filing amended pleadings passed without event, Defendants had no reason to, and by all accounts did not, pursue that line of questioning. Thus, if the Secretary's motions to amend are granted, Defendants will need to re-locate, re-subpoena, and re-depose the claimants who named the other individuals that the Secretary now seeks to add, precisely to ask those questions, adding a significant and entirely avoidable cost to this litigation. This is, of course, assuming that the deponents can in fact be located again, and that their memories have not faded in the year or more that has passed since their original deposition, two contingencies which are likely to be realized unfavorably to Defendants given the passage of time and the itinerate nature of these

*AFW*

workers' employment. Therefore, the court concludes that clear and significant prejudice to Defendants would result by allowing the Secretary to amend her complaint at this stage of the case.

### C. Conclusion

For the reasons stated above, the court finds that the Secretary has failed to show "good cause" why the second motion to amend should be granted, therefore the motion is DENIED.

*Motion for Sanctions*

## I. Facts

Defendants have moved for sanctions against both Matthew L. Vadnal, counsel for the Secretary, and Karen Clark, who conducted the investigation on which this action is based. The court reviews the facts relating to these two individuals separately.

### A. Karen Clark

Karen Clark ("Clark") is a Wage Hour Investigator with the Department of Labor's Employment Standards Administration. (Declaration of Karen Clark In Support of the Secretary's Response to the Defendants' Motion for Sanctions ("Clark Decl. re Sanctions") ¶ 1). In that role, Clark is required to be objective and neutral and not to favor claimants over employers. (Declaration of Krista N. Hardwick In Support of Defendants' Motion for Summary Judgment ("Hardwick Decl. ISO Sanctions") Ex. A, Deposition of Karen Clark ("Clark Dep.") 43:14-21). When speaking with potential claimants, Clark explains the protections available to them under the FLSA and also what kind of documents and other evidence, like corroborating testimony, can be helpful to establish their claim. (Clark Dep. 45:18 - 47:3; Clark Decl. re Sanctions ¶ 16). The information Clark provides to employers depends on the circumstances of the case she is investigating; primarily, she requests payroll records and other comparable information, and waits until the final conference to go over the

*AFW*

claims and the employers concerns and evidence. (Clark Dep. 47:4 - 49:20). Clark holds the final conference when she has determined that there are violations. (*Id.* at 89:3-7). The final conference is generally the first time that the employer is presented with the alleged violations and given an opportunity to provide information to refute the charges. (*Id.* at 89:10 - 90:4). However, investigators do not hold final conferences in all cases. (*Id.* at 90:21-23). This case was submitted to counsel without a final conference and before Defendants were given the opportunity to refute the claims against them. (*Id.* at 90:6-8, 93:12-19).

Clark's investigation initiated as the result of a referral from the Oregon Bureau of Labor and Industries ("BOLI"). (Clark Decl. re Sanctions ¶ 2, 4). At the time of the referral, BOLI had received a total of ten complaints. *Id.* During the course of her investigation, Clark interviewed fifty two people, including seven Westside supervisors, two estimators, two office workers, eleven subcontractors, and thirty manual laborers. (Clark Decl. re Sanctions ¶ 6). She visited Westside's facility in Hubbard on May 31, 2007, and held an initial conference with Shirine Salem, during which she advised Ms. Salem of the general scope of the investigation, obtained business, coverage, and employee information, and requested that payroll and time records be assembled for Clark to review at a later date. (Clark Decl. re Sanctions ¶ 5). Over the course of her investigation, Clark made four visits to the Westside facility in Hubbard and met with Ms. Salem during each of those visits. (Clark Decl. re Sanctions ¶ 16). Clark used Westside's payroll records to compute back wages for Efren Carmen, Florencio Diaz Bernabe, Miguel Mendoza Herrera, Juan Ramirez Reyes, Luis Ernesto Sepulveda, Jorge Jimenez Naranjo, Virgilio Martinez, and Enrique Sanchez. (Clark Decl. re Sanctions ¶ 14). On March 16, 2010, the court granted the Secretary's motion to dismiss with prejudice the claims for back wages made on behalf of Efren Martinez Carmen, Florencio Diaz

Page 57 - OPINION AND ORDER                                                    *AFW*

Bernabe, Miguel Mendoza, Juan Ramirez, and Luis Ernesto Sepulveda.  (Docket No. 107).

Clark took personal interview statements from the workers she interviewed, including the following claimants:  Jorge Jimenez Naranjo on September 4, 2007; Francisco Ramirez, Luis Umberto Rodriguez, and Jose Gaspar on September 24, 2007; Jose Mauricio Mondragon-Gaspar on May 14, 2007; and Jorge Humberto Rodriguez Castillo on May 17, 2007.  (Clark Decl. re Sanctions ¶ 9, Ex. C through H).  During the course of her investigation, Clark personally met with twenty two Westside employees.  (Clark Decl. re Sanctions ¶ 17).  She did not ask for identification or otherwise verify the identity of the claimants when speaking to them, and is unaware whether their identity has ever been verified. (Clark Dep. 152:15 - 153:6).  If the person she was interviewing mentioned other people, Clark calculated a potential claim for that person using the name, days and hours worked provided by the person being interviewed without any other verification.  (Clark Dep. 166:2 - 168:3).  Clark received a number of time sheet worksheets related to this action from BOLI; as part of her wage claim calculations she compared these documents to the original statements claimants made to her or in their BOLI complaint.  (Clark Dep. 97:2-6, 98:11 - 99:25).  Clark assumed that these worksheets were turned in to Westside by the workers but did not confirm this assumption.  (*Id.* at 97:12-15, 104:14-23).  Clark believed that Westside paid the individual workers according to these worksheets, which represented the days and hours worked.  (*Id.* at 104:7-14).

Clark noted several patterns in the evidence, including allegations that workers were paid in cash at flat rates regardless of overtime work, were subject to unexplained pay deductions, were provided with the tools and materials necessary for the job by Westside, and were instructed, supervised, and sometimes paid by Westside employees.  (Clark Decl. re Sanctions ¶ 7-8).  Clark knew that one of Defendants' allegations was that the claimants in this case were not Westside

employees, but rather employees of subcontractors, but she did not know any specifics about which claimant worked for what subcontractor. (Clark Dep. 110:3-17). Clark asked Defendants to produce their payroll records but did not ask for employment records for subcontractor employees, in part because she already had the documentation from BOLI and the claimants statements detailing how they were paid and by whom, and in part because the very nature of the alleged arrangement led her to believe that Westside would not have any documentation to produce. (Clark Dep. pp. 113-118).

Clark did not ask Defendants whether they had business cards for their subcontractors. (Clark Dep. 204:17 - 205:1). She asked for a list of Westside's subcontractors because she needed to establish the nature of the relationship with those subcontractors; Defendants provided that list. (*Id.* at 112:8-17). Clark asked whether Defendants could provide contracts or bids from their subcontractors, but was told no such records or documents existed; thus she concluded that she would need to independently determine the nature of the relationship between Westside and its subcontractors. (*Id.* at 118:10-14). At that time, she believed that the claims were credible. (*Id.* at 119:7-14). Clark researched subcontractors with whom Westside did work during the relevant period through the Oregon Construction Contractors Board and the Oregon Secretary of State Corporation Division. (Clark Decl. re Sanctions ¶ 10). She also tried to physically locate the subcontractors, but was unable to find fourteen of them. (Clark Decl. re Sanctions ¶ 10). She spent a significant amount of time trying to track down the subcontractors, but in many cases the person she made contact with would refer her to another person, and ultimately she was able to make contact with only a few. (Clark Dep. 158:8 - 158:25). Clark did not contact other general contractors to see whether they also did work with the same subcontractors as Westside. (Clark Dep. 157:10 - 158:7).

Page 59 - OPINION AND ORDER                                              *AFW*

Clark participated in a February 4, 2008, conference call and a May 21, 2008 meeting with Defendants' counsel. (Clark Decl. re Sanctions ¶ 11-12). Following the May 21 meeting, Clark conducted follow up with five claimants to test Defendants' factual assertions; the claimants denied that Defendants' factual assertions were accurate. (Clark Decl. re Sanctions ¶ 13). Clark does not recall being presented with boxes of information at any meeting or declining to review any documents. (Clark Dep. 129:1-22). She has not looked through the files Westside maintains for its subcontractors. (*Id.* at 129:23 - 130:1). She is aware that Defendants have produced a significant number of documents during the course of discovery, but does not know how many documents and has not reviewed them. (*Id.* at 147:22 - 148:10).

   *B.  Matthew L. Vadnal*

Matthew L. Vadnal ("Vadnal") is a trial attorney with the Unites States Department of Labor, Office of the Solicitor, and is the attorney of record in this action. (Declaration of Matthew L. Vadnal In Support of the Secretary's Response to the Defendants' Motion for Sanctions ("Vadnal Decl. re Sanctions") ¶ 1). Vadnal received this case from the Portland Wage Hour office in November 2007. (Vadnal Decl. re Sanctions ¶ 2). The parties executed four tolling agreements, which cumulatively prevented the statute of limitations from running between December 1, 2007 and September 30, 2008. *Id.* Vadnal participated in a February 4, 2008, conference call with Clark and Chrys Martin, counsel for Defendants ("Martin"). (Vadnal Decl. re Sanctions ¶ 4). He followed up with a letter February 6, 2008, reiterating the Secretary's request for information relevant to the question of whether Westside's subcontractors were bona fide independent contractors, and also requesting a list of all persons paid in cash by Westside, updated contact information for Westside's subcontractors, and name, address, and phone numbers for all persons employed by Westside's

*AFW*

subcontractors. (Vadnal Decl. re Sanctions ¶ 5, Ex. A). Defendants denied that Westside makes cash payments to anyone and stated they did not have access to their subcontractors' employment records. (Vadnal Decl. re Sanctions ¶ 6).

On May 21, 2008, Vadnal, his supervisor, Clark, and her supervisor, attended a meeting with Martin, Krista Hardwick, counsel for Defendants ("Hardwick"), Mohsen Salem, and Shirine Salem at the law offices of Bullivant, Houser and Bailey in Portland. (Vadnal Decl. re Sanctions ¶ 7). Defendants provided 105 pages of material in support of the contention that the claimants in this action were employed by subcontractors. *Id.* Vadnal states he reviewed these materials. *Id*

On July 29, 2008, Vadnal attended another meeting with Martin and Ms. Salem at the law offices of Bullivant, Houser and Bailey in Portland. (Vadnal Decl. re Sanctions ¶ 8). Defendants provided voluminous documents, including Exhibit 10 to Clark's deposition. (Vadnal Decl. re Sanctions ¶ 9). Exhibit 10 to Clark's deposition is a five-page letter, dated June 26, 2008 from Martin to Vadnal, with four attached exhibits. (Hardwick Decl. ISO Sanctions, Ex. A, Clark Dep., Deposition Exhibit 10). The attached exhibits are Exhibit 1, a 265 page document consisting primarily of calendar print outs with handwritten notes (129 pages) and materials invoices (107 pages); Exhibit 2, the Declaration of Dave Templeton, In-Process Compliance person for Centex Homes (this declaration is not made under penalty of perjury); Exhibit 3, a 5 page, 11 column spreadsheet, apparently breaking down the amount paid by week between September 13, 2004, and October 3, 2007, to ten listed subcontractors; and Exhibit 4, a one page, three column table listing eight subcontractors, the date the contractor obtained a CCB license, and the date the contractor did their first job for Westside. (Hardwick Decl. ISO Sanctions, Ex. A, Clark Dep., Deposition Exhibit 10, Ex. 1 through 4). Vadnal states he has reviewed the documents in Exhibit 10. (Vadnal Decl. re

*AFW*

Sanctions ¶ 10). However, in an electronic letter to Martin dated August 25, 2008, Vadnal stated that he had not been able to compare the materials Defendants provided with his investigative information. (Declaration of Chrys Martin In Support of Defendants Motion for Sanctions ("Martin Decl. ISO Sanctions") ¶ 7 & Ex. B).

Defendants agree that there were two meetings, but fail to provide the court with the dates and participants in those meetings. (Defendants Reply In Support of Motion for Sanctions ("Sanctions Mtn. Reply.") at 7). Defendants allege that in June of 2008, Defendants and their counsel met with the Secretary's counsel (presumably Vadnal) and investigator (presumably Clark), that Defendants brought "several boxes of well organized documents" to the meeting, explained their contents, and offered to give the boxes to "Plaintiff" for review, and that this offer was declined because there were "too many" documents and "Plaintiff" did not have time to review them. (Martin Decl. ISO Sanctions ¶ 4). Defendants allege the offer was extended to Vadnal a second time on June 26, 2008; however, he did not act on the offer. (Martin Decl. ISO Sanctions ¶ 5). Finally, Defendants allege that the offer was extended to Vadnal a third time on July 8, 2008, when Defendants' counsel sought an update on whether he had been able to review certain declarations Westside had provided and informed him that backup materials were available at Defendants' counsel's office, and not only did Vandal reply that he had not had the chance to review the declaration evidence, but he did not act on the offer to review the "backup materials." (Martin Decl. ISO Sanctions ¶ 7). It is not clear whether the "backup materials" is the same evidence offered at the June 2008 meeting or in the July 8, 2008, letter.

Defendants' counsel have repeatedly requested that Vadnal dismiss certain claims from this action. (Hardwick Decl. ISO Sanctions ¶ 4). In a letter by Clay D. Creps dated January 26, 2009,

*AFW*

Defendants' counsel asked Vadnal to dismiss with prejudice the claims for Sabas Fernandez Hernandez, Luis Ernesto Sepulveda, Efren Martinez Carmen, Florencio Diaz Bernabe, Miguel Mendoza, Juan Ramirez Reyes, Angel Ramos, all claims for claimants properly subpoenaed who failed to appear for their depositions, and all claims for non-testifying claimants. (Hardwick Decl. ISO Sanctions ¶ 4 & Ex. B3). In a second letter by Clay D. Creps dated February 11, 2009, Defendants' counsel again asked Vadnal to dismiss with prejudice all claims for claimants properly subpoenaed who failed to appear for their depositions, and all non-testifying claimants. (Hardwick Decl. ISO Sanctions ¶ 4 & Ex. B2). By letter dated February 13, 2009, Vadnal responded that he was not ruling out dismissal but was not prepared to dismiss any claims until the close of discovery, noting that until that time he could not properly assess the factual basis for each claim; furthermore, Vadnal offered assistance in locating deponents who had either failed to appear or could not be served. (Vadnal Decl. re Sanctions, Ex. D). In a third and final letter by Clay D. Creps dated February 17, 2009, Defendants' counsel asked Vadnal to dismiss with prejudice Shirine Salem as a defendant and all claims for "willful" FLSA violations allegedly occurring before December 1, 2004, and all claims for "non-willful" FLSA claims occurring before December 1, 2005. (Hardwick Decl. ISO Sanctions ¶ 4 & Ex. B1). Vadnal responded by letter dated February 26, 2009, that he was unprepared to dismiss Shirine Salem prior to her deposition, and declining to dismiss any claims as time barred, reserving these requests for discussion at the "mediation phase" of the case. (Vadnal Decl. re Sanctions, Ex. E). On March 16, 2010 the court entered judgment granting the Secretary's motion to dismiss with prejudice defendant Shirine Salem; all claims for back wages earned before December 1, 2004; and claims for back wages for Luis Ernesto Sepulveda, Efren Martinez Carmen, Florencio Diaz Bernabe, Miguel Mendoza, Juan Ramirez, and Angel Ramos. (Docket No. 107)

II. Legal Standard

Three primary sources of authority enable courts to sanction parties or their lawyers for improper conduct: (1) FRCP 11, which applies to signed writings filed with the court, (2) 28 U.S.C. § 1927, which is aimed at penalizing conduct that unreasonably and vexatiously multiplies the proceedings, and (3) the court's inherent power.

*A. FRCP 11*

Under FRCP 11, a court may impose sanctions against an attorney, law firm, or party when a complaint is filed for an improper purpose such as harassment or delay, when the claims in the complaint are unwarranted under either existing law or a nonfrivolous argument for extension of the law, or when the allegations in the complaint are without evidentiary support and unlikely to have evidentiary support after further investigation and discovery. FRCP 11(b) & (c). When evaluating whether a complaint is frivolous or without evidentiary support, the court "must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (internal quotation marks and citation omitted). As shorthand for this test, the Ninth Circuit uses the word "frivolous" "to denote a filing that is *both* baseless *and* made without a reasonable and competent inquiry." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc). Whether a complaint is "frivolous" is determined using an objective standard of reasonableness. *Id.* Not all of a complaint's claims must be frivolous for Rule 11 sanctions to be appropriate. *Id.* at 1363.

*B. 28 U.S.C. § 1927*

Unlike FRCP 11, 28 U.S.C. § 1927 does not apply to initial pleadings, but rather authorizes

*AFW*

sanctions only for the multiplication of proceedings, and is therefore only applicable to unnecessary filings and tactics once a lawsuit has begun. *In re Keegan Mgmt. Co., Securities Litig.*, 78 F.3d 431, 434 (9th Cir. 1996) (internal citations omitted). To impose sanctions under section 1927, the court must make a finding of bad faith. *West Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1528 (9th Cir. 1990) (internal citation omitted). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1185-86 (9th Cir. 1988) (internal quotations and citation omitted).

C. *Inherent Power*

A federal court may levy sanctions under its inherent power for willful disobedience of a court order, when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, and against counsel who willfully abuse judicial processes. *Fink v. Gomez*, 239 F.3d 989, 991-92 (9th Cir. 2001) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980)) (internal quotations omitted). The inherent power "extends to a full range of litigation abuses," however, the litigant must have "engaged in bad faith or willful disobedience of a court's order." Id. at 992 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46-47 (1991)) (emphasizing the continuing need for resort to the court's inherent power).

III. Analysis

Defendants rely heavily on excerpts from Karen Clark's deposition testimony as proof that she failed to conduct an adequate investigation of the claims against them and therefore sanctions are appropriate against her under the inherent power of the court. Defendants also argue that Vadnal relied on Clark's investigation even though he had notice of her bias, that he failed to conduct any

Page 65 - OPINION AND ORDER                                          *AFW*

significant independent factual analysis of his own, and finally that his repeated refusal to produce certain evidence and to dismiss certain claims when the discovery process revealed that they were meritless forced Defendants to file motions to compel, for summary judgment, and for sanctions, therefore sanctions are appropriate against him under FRCP 11, 28 U.S.C. § 1927, and the inherent power of the court.  Because the sufficiency of Clark's investigation is at the heart of these arguments, the court begins there.

A.  *Karen Clark's Investigation*

The court finds that sanctions are not appropriate against Karen Clark.  The court recognizes that during the course of her investigation, Clark became convinced of the merit of the claims made by the workers from whom she took statements and with whom she interacted.  The record shows that to some extent Clark's objectivity probably diminished over time.  However, the court does not find that Clark acted in bad faith, or for an improper purpose, or that her determination that the claims had merit was otherwise "frivolous."  The record shows that Clark consistently received claims alleging suspicious pay practices, that she requested appropriate documentation from Defendants to substantiate those claims, that she considered all of the evidence made available to her in calculating the wage claims, and that she attempted to contact the subcontractors identified by Defendants as actually employing the claims, all *before* she recommended the case to Vadnal.

The record does not show that during the course of her preliminary investigation, Clark refused to consider information and evidence made available to her.  It is true that while she did not have specific detail, Clark knew that Defendants generally alleged that the claimants were actually employees of subcontractors but did not ask Defendants to provide her with information regarding these employee relationships.  The record supports the conclusion that Clark did not ask Defendants

*AFW*

to provide these records because she did not believe Westside maintained them. And, in fact, when Vadnal requested this information in his letter February dated 6, 2008, Defendants responded by stating that they did not have access to records showing who their subcontractors employ. While there is no evidence that Defendants have any information that identifies which claimants worked for what subcontractors or that this information is readily accessible from the subcontractors, the court finds that there is evidence that Clark made diligent, if unsuccessful, efforts to contact Westside's subcontractors.

Likewise the court does not find that Clark's actions in logging and calculating wage claims is sanctionable. The Secretary may assert claims on behalf of unknown and unlocated persons. *Am. Waste Removal Co.*, 748 F.2d at 1410. Therefore, this court cannot find that Clark erred by not verifying the identity of the people she took statements from, or by creating claims for third persons identified in these statements without contacting those people or having full identifying information for them. Defendants argue that these statements are inadmissible evidence. This is only true if they are offered for the truth of the matter asserted. FRE 801. However, this argument misses the point, which is whether Clark's conduct on this aspect of the case is sanctionable. The issue here is not whether the statements are true, but whether it is objectively reasonable that Clark believed that they were. The court finds that the record supports the conclusion that she did.

Furthermore, the court does not find that Clark failed to examine the evidence available to her. She has provided sworn testimony that she reviewed all documentation provided to her. Defendants argue that it is the failure to consider evidence provided during the course of discovery which is sanctionable. (Defendants' Reply in Support of Motion for Sanctions at 2). This happened after Clark referred the case to Mr. Vadnal. Vadnal testified that he reviewed this evidence and

*AFW*

passed along only certain portions of it to Clark. This is consistent with Clark's deposition testimony. She did not recognize Exhibit 10 beyond the five-page letter from Chrys Martin and the eight-page summary document. (Clark Dep. 133:5 - 134:21). When asked why she did not review the documents attached to the letter, Clark responded that she reviewed all the documents that were provided to her and specifically recalled the summary document. (*Id.* at 136:24 - 137:13). She conducted follow-up interviews with claimants as requested by Vadnal, and received and relayed feedback that the claimants nearly uniformly denied Defendants' factual assertions.

Finally, the court is unable to determine that Clark's failure to conduct a final conference with Defendants is sanctionable. It is apparent from her deposition testimony that this conference is not always conducted, although the reason why is not evident since that portion of Clark's deposition testimony was not submitted. On the evidence submitted, the court does not find that Clark may be sanctioned for failing to conduct this conference before referring the case to Mr. Vadnal.

For the reasons above, Defendants' motion for sanctions against Ms. Clark is DENIED.

### B. Matthew L. Vadnal

The court finds that sanctions are not appropriate against Matthew Vadnal. First, because the court finds that Clark's investigation was adequate, the court finds that Vadnal is not subject to sanctions for relying on it. The next question that the court must address is whether Vadnal failed to review evidence proffered by Defendants subsequent to his involvement. In his letter to Defendants' counsel August 25, 2008, a mere five weeks before filing this suit, Vadnal admitted that he had not compared the "voluminous materials" provided by Defendants with his own investigative files. The court cannot say that it is impossible for Vadnal to have conducted a searching review of

the evidence in the five intervening weeks, although it seems improbable.  The court has been provided only one specific example of documents which Vadnal states he reviewed:  the documents in Exhibit 10 of Karen Clark's deposition.  As noted above, these documents consist primarily of calendar print outs with handwritten notations and materials invoices. The court is not prepared to say that these documents are incontrovertible or even substantive evidence that irrefutably establish the merits of Defendants' position.  It is equally unclear what these documents prove, if anything, and what Vadnal did with the information.  Because the documents are not dispositive proof one way or the other, they do not provided a basis supporting the imposition of sanctions.

Defendants argue that had Vadnal examined all of the documents they offered, he would have discovered evidence that the time sheet worksheets submitted by the claimants were blatantly falsified.  Defendants offer as proof Exhibit A to Mr. Salem's declaration in support of the motion for sanctions.  The court has carefully reviewed these documents, and finds that while the documents might call into question the genuiness of the information contained therein, that fact does not compel a finding that sanctions should be imposed against an attorney who relies on them as part of a larger group of evidence.  Specifically, subparts A2 through A7 of Exhibit A consist of time sheet worksheets, redacted to remove the worker's name, highlighting specific entries for work done on specific dates associated with a job number, builder, and property address. Each of these worksheets is followed by a number of documents such as invoices for materials and labor, client invoices, materials purchase orders, lien notices, and canceled checks, which match the job number, builder, and property address on the worksheet. The issue is the dates.  The worksheets consistently show entries for work done for projects which, according to the underlying evidence, had either been completed months before or were not begun until months later.  The court agrees with Defendants

Page 69 - OPINION AND ORDER                                    *AFW*

that this evidence casts doubt on the reliability of this time sheet worksheet. However, it is unclear how much evidence of this kind exists, that is, how many worksheets are or could be discredited by like evidence. Furthermore, the worksheets were only part of the evidence Clark considered when calculating the wage claims, and were by her testimony incomplete. Therefore, the court is unable to find that this evidence is sufficient to form the basis for the imposition of sanctions.

The court finds no evidence of sanctionable conduct in the Secretary's voluntary dismissal of the claims asserted on behalf of Carmen, Bernabe, Mendoza, Ramirez, Ramos, and Sepulveda, or the court's grant of summary judgment in favor of Defendants regarding Hernandez. The claims were dismissed at the close of discovery, after depositions were taken from these claimants. The court cannot say that Vadnal erred by declining to dismiss these claimants until discovery was closed. It appears that Clark took interview statements from these claimants in which they alleged conduct forming a factual basis for a FLSA violation claim. Until these statements were refuted by the deponents' sworn testimony, and all other discovery was concluded so as to eliminate the possibility that these claimants were recanting their previous statements out of fear of retaliation, Vadnal was justified in retaining the claims. Compare *Berquist v. Fidelity Info. Servs., Inc.*, 399 F. Supp. 2d 1320, 1334 (M.D. Fla. 2005) (Rule 11 sanctions not appropriate where plaintiff articulated several non-frivolous arguments in support of FLSA claims, even though defendant prevailed on claims at summary judgment and plaintiff voluntarily dismissed other claims), with *Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005) (Rule 11 sanctions appropriate where "even the most cursory legal inquiry would have revealed" that there was no legal basis for plaintiff's claims); *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002) (Rule 11 sanctions appropriate where lack of factual basis for copyright infringement lawsuit was available through physical examination

of product); *Kunimoto v. Fidell*, No. 00-15157, 00-15202, 2001 WL 1480656, at *1 (9th Cir. 2001) (Rule 11 sanctions appropriate where plaintiff's lacked standing to file claim); *Smith & Green Corp. v. Tr. of the Const. Indus. & Laborers Health & Welfare Trust*, 244 F. Supp. 2d 1098 (D. Nev. 2003) (Rule 11 sanctions appropriate where plaintiff brought state law claims clearly preempted by federal law).

Defendants also argue that sanctions are appropriate under 28 U.S.C. § 1927 because despite Defendants' three letters requesting that he do so, Vadnal refused to dismiss certain claims and Ms. Salem from this case. The court is unable to find that Vadnal erred in dismissing Ms. Salem before taking her deposition. Although the parties dispute whether Ms. Salem ever told Clark that she had an ownership interest in Westside, the court need not make this determination. Once Vadnal had Ms. Salem's sworn testimony directly contradicting the earlier (now contested) statement, he dismissed her from the case. On these facts, the court does not find that Vadnal acted in bad faith or recklessly. *E.g., Entertainment by J & J, Inc. v. Lee*, No. 03-16155, 2005 WL 663452, at *1 (9th Cir. Mar. 10, 2005) (§1927 sanctions appropriate where court "specifically found plaintiff's attorney acted recklessly by not fully investigating her claim, especially after information discrediting her primary witness was brought to light"). Therefore, the court is unable to find that Vadnal's behavior is sanctionable.

Finally, at oral argument Defendants argued that sanctions may appropriately be imposed in this case because the Plaintiff here is the Secretary of Labor. Specifically, Defendants argued that the Department of Labor is a regulatory agency wielding the full weight and authority of the federal government, and the inherent power the Secretary wields on behalf of the agency warrants holding the Secretary to a higher standard when judging whether her actions, and the actions of her

representatives and attorneys, are sanctionable. Defendants offered no authority in support of their argument. The court is not aware of any authority holding that a party's identity or status as a federal agency alters the traditional application of the Rule 11 standard. Thus, the court rejects Defendants' argument. The standard for imposing sanctions under Rule 11, 28 U.S.C. § 1927, or the inherent power of the court applies to all litigants equally, and is met or not based on the facts asserted in support of the challenged action, not the identity of the challenged party.

Accordingly, Defendants' motion for sanctions is DENIED.

### Conclusion

For the reasons given above, Defendants' motion to strike is GRANTED, subject to the limitations set out above; Defendants' motion for summary judgment is DENIED in part and GRANTED in part; the Secretary's motions to amend are DENIED, and Defendants' motion for sanctions is DENIED.

IT IS SO ORDERED.

Dated this _____13th_____ day of May, 2010.


JOHN V. ACOSTA
United States Magistrate Judge